Argued and submitted September 6, 1995, accused is suspended from the practice of law for one year January 26, 1996

# In re Complaint as to the Conduct of

## WILLIAM J. CLAUSSEN,
### *Accused.*

## (OSB 91-145; SC S42174)

909 P2d 862

Gary M. Bullock, Portland, argued the cause for the accused. William E. Loose, Portland, filed the brief for the accused.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the briefs for the Oregon State Bar.

PER CURIAM

## PER CURIAM

This is a *de novo* review of a lawyer disciplinary proceeding. ORS 9.536(3); Bar Rules of Procedure (BR) 10.6. The Oregon State Bar (Bar) filed a formal complaint against the accused alleging, in three causes of complaint, multiple violations of the Disciplinary Rules of the Code of Professional Responsibility (DR) and ORS 9.460(2) in connection with his representation of certain clients in a bankruptcy proceeding and a related matter. A trial panel of the Disciplinary Board found that the accused had violated DR 5-105(E) (current client conflicts)[1] and DR 1-102(A)(3) (conduct involving dishonesty, fraud, deceit or misrepresentation),[2] dismissed the remaining charges, and imposed a reprimand. The Bar seeks review. *See* BR 10.3 (the Bar or the accused may request review of a trial panel's opinion finding the accused not guilty or imposing discipline by reprimand or suspension not to exceed 60 days).

■ The Bar has the burden of establishing ethical misconduct by clear and convincing evidence. BR 5.2. "Clear and convincing evidence" means evidence establishing that the truth of the facts asserted is highly probable. *In re Johnson,* 300 Or 52, 55, 707 P2d 573 (1985). As did the trial panel, we find the accused guilty of violating DR 5-105(E) and DR 1-102(A)(3). We also find the accused guilty of violating DR 7-102(A)(3) (two counts) (to conceal or knowingly fail to

---

[1] DR 5-105(E) provides:

"Except as provided in DR 5-105(F), a lawyer shall not represent multiple current clients in any matters when such representation would result in an actual or likely conflict."

DR 5-105(F) provides:

"A lawyer may represent multiple current clients in instances otherwise prohibited by DR 5-105(E) when such representation would not result in an actual conflict and when each client consents to the multiple representation after full disclosure."

[2] DR 1-102(A)(3) provides:

"It is professional misconduct for a lawyer to:

"* * * * *

"Engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

disclose that which the lawyer is required by law to reveal);[3] DR 7-102(A)(5) (knowingly making a false statement of law or fact);[4] DR 1-102(A)(4) (engaging in conduct that is prejudicial to the administration of justice);[5] and ORS 9.460(2) (misleading the court).[6] We suspend the accused from the practice of law for one year.

## FACTS

We find the following facts:

The accused was admitted to practice law in Oregon in 1969. He was an experienced bankruptcy lawyer. In 1989, the accused's firm, Claussen & Associates, employed associate lawyer Douglas Combs, who worked in the firm's Portland office. The accused worked in the firm's principal office in Salem.

The charges against the accused stem from his representation, beginning in 1988, of Sloan Smith; Mr. Smith's wife, Linda Smith; and several closely held corporations owned by the Smiths, including Teknetics, Inc. (Teknetics), Tek, Ltd. (Tek), and Overtrade, Inc. (Overtrade). Teknetics

---

[3] DR 7-102(A)(3) provides:

"In the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not:

"* * * * *

"Conceal or knowingly fail to disclose that which the lawyer is required by law to reveal."

[4] DR 7-102(A)(5) provides:

"In the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not:

"* * * * *

"Knowingly make a false statement of law or fact."

[5] DR 1-102(A)(4) provides:

"It is professional misconduct for a lawyer to:

"* * * * *

"Engage in conduct that is prejudicial to the administration of justice."

[6] ORS 9.460(2) provides:

"An attorney shall:

"* * * * *

"Employ, for the purposes of maintaining the causes confided to the attorney, such means only as are consistent with truth, and never seek to mislead the court or jury by any artifice or false statement of law or fact[.]"

originally was organized to build and sell metal detectors. Tek was the successor operating company. Teknetics continued to hold patents and to be a debtor on a variety of obligations. The accused had known the Smiths for about 20 years. They were acquainted through church and social organizations and were "good friends."

In early 1988, the Commercial Bank had a security interest in certain of Teknetics' assets, which secured a loan of almost $1 million. In April 1988, Linda Smith, without the accused's assistance, purchased that loan from the Commercial Bank at a substantial discount, thereby becoming Teknetics' principal creditor.

In 1989, Sloan Smith represented to the accused that he was the principal and sole shareholder of Teknetics and Overtrade, both of which operated from a building leased from Springhill Fuel Company (Springhill). Apparently, Overtrade was organized to lease the building from Springhill. The Small Business Administration (SBA) had a security interest in Teknetics' patents for a loan of $238,000. Teknetics leased its patents and equipment to Tek, which was wholly owned by Linda Smith.

In March 1989, Springhill filed an action in circuit court against Teknetics, Tek, Overtrade, and Sloan Smith individually, to recover rents due under the lease. Springhill also locked Smith and the Smith corporations out of the building and asserted a landlord's lien over the property in the building. The accused then filed a Chapter 11 bankruptcy petition on behalf of Overtrade, thereby obtaining a stay of Springhill's action. *See* 11 USC § 362 (filing of bankruptcy automatically stays creditors' collection efforts). In May, the bankruptcy court granted Springhill's motion for relief from the automatic stay previously obtained by Overtrade.

Springhill then moved to join Linda Smith as a defendant in its circuit court action, based on her claimed security interest in the property being held by Springhill, over which Springhill was asserting a lien. The circuit court's order allowing that motion states that the accused and Douglas Combs represented Linda Smith.

In 1986, Sloan Smith filed a voluntary individual Chapter 11 petition. It was converted to a Chapter 7 proceeding in 1987. The accused's firm did not represent Smith in those matters.

In June 1989, Claussen & Associates was retained by Sloan Smith to represent him in an adversary action *within* his personal bankruptcy proceeding. The representation was handled by Combs. The adversary proceeding was filed by Gulf Stream Aerospace Corporation, which had obtained a judgment against Sloan Smith and was seeking to deny him any discharge in bankruptcy. Discharge ultimately was denied because of Sloan Smith's numerous violations of 11 USC § 727 (grounds for denial of discharge of debts, including attempts by debtor to defraud creditors, concealment of assets, and withholding of information). The bankruptcy judge stated in part:

> "Individually, any one error of omission of the debtor in these proceedings may have been the result of an innocent mistake. The accumulation of all the omissions and dereliction evidences a pattern of reckless and cavalier disregard sufficient to supply the necessary fraudulent intent required by 11 U.S.C. §727(a)(4)(A)."

The bankruptcy judge found that it "would be virtually impossible to characterize all the ways in which funds have flowed between [Teknetics and Overtrade] and the Smiths during the bankruptcy."

On June 6, 1989, Combs prepared a letter on behalf of Linda Smith to George Payne, Teknetics' president. It identified Linda Smith as the holder of a security interest in Teknetics' property and demanded full payment of the underlying debt. On that same day, Combs prepared a response on behalf of Payne, advising Linda Smith that Teknetics could not pay the debt and inviting her to assert her rights over Teknetics' property being held by Springhill. Combs then wrote to Springhill's counsel and informed him that the accused's office represented Linda Smith and that her interest in the property took priority over Springhill's lien.[7]

---

[7] In 1990, the accused testified in bankruptcy court that he was not aware of the June 6 letters prepared by Combs in the Springhill litigation or of their

On June 8, Combs moved for an order requiring Springhill to show cause why it should not surrender the property to Linda Smith. On June 16, Combs filed an answer in the Springhill case on behalf of Linda Smith, asserting that her secured interest in the property took priority over Springhill's lien. On June 23, Combs also answered Springhill's complaint on behalf of Teknetics, Overtrade, Tek, and Sloan Smith. Claussen & Associates continued to represent Teknetics, Overtrade, Tek, Sloan Smith, and Linda Smith in the Springhill litigation through the end of 1989. The accused was aware of this representation by his firm, although the day-to-day work on the Springhill case was handled by Combs. In August, the SBA, Teknetics' other major creditor, threatened to foreclose on its loan, which would have shut down the Smiths' business enterprise.

On August 18, the accused filed a Chapter 11 bankruptcy petition on Teknetics' behalf.[8] The petition identified Linda Smith as Teknetics' largest creditor, with the company owing her some $930,000, and stated that her interest was secured by equipment and inventory. Springhill was identified as an unsecured creditor. The petition did not request the appointment of a trustee and, consequently, Teknetics became the debtor-in-possession. At the time of filing the petition, the accused failed to file either an Application to Employ Attorney for Debtor and Certificate of Disinterestedness or a Verified Statement of Professional. When the accused undertook to represent Teknetics in the bankruptcy, he was aware that his associate Combs was representing the Smiths and their related entities in the Springhill litigation. During this period, the accused represented Sloan Smith in

intended purpose with respect to the assets of Teknetics. He also testified that he first became aware of Linda Smith's assertion of a security interest in Teknetics' assets when he was preparing Teknetics' bankruptcy petition. In a 1994 deposition taken in the course of this proceeding, however, the accused testified that, although he was not present when Combs prepared the June 6 letters, he *was* aware at that time that Combs would take that course of action. Moreover, before the trial panel, the accused testified that he "knew that letters were being written, but * * * did not know the contents of the letters."

[8] Before the trial panel, the accused testified that Sloan Smith filed the Teknetics bankruptcy proceeding in order to gain time to deal with the SBA and to settle with Springhill, and that Smith had no intention of filing a reorganization plan. The accused also testified that, as of the date of filing the petition, Teknetics had been shut down for two or three years and had no cash flow whatsoever.

defending an adversary proceeding in his personal bankruptcy, a separate proceeding.

In September 1989, the accused filed a document in the Teknetics' bankruptcy proceeding entitled "Application to Employ Attorney for Debtor and Certificate of Disinterestedness." The document stated that the accused's firm was to render to Teknetics "legal advise [sic] with respect to negotiations with secured creditors, the unsecured creditor's committee and other interested parties;" that, "to the best of your applicant's knowledge, [Claussen & Associates] has no connection with the creditors or other parties in interest in this matter, or their respective attorneys;" and that Claussen & Associates "represents no interest adverse to the Debtor or to the estate in the matters upon which it is to be engaged on behalf of the Debtor." The accused signed the document as "of Attorneys for Debtor," naming Teknetics as the debtor. A separate document entitled "Verified Statement of Professional," filed by the accused with the court at the same time, stated in part that Claussen & Associates had no connection with the debtor (Teknetics), creditors, or any other party in interest. The accused also signed that document as "of Attorneys for Debtor." In neither document did the accused disclose his relationship with either Sloan Smith or Linda Smith in other proceedings.[9] Based on those representations, the bankruptcy judge entered an order appointing the accused as Teknetics' lawyer in the bankruptcy proceeding.[10]

In October, Springhill moved the bankruptcy court for an order dismissing Teknetics' Chapter 11 petition, alleging that Teknetics did not have any equity in the property, that its petition had been filed in bad faith, that Teknetics

---

[9] The accused argues that his secretary prepared the documents and that he signed them without reading them. He admits that the documents were false, but argues that his conduct was only negligent, rather than intentional.

[10] The bankruptcy judge testified before the trial panel that, had she known at the time that the accused also represented Linda Smith personally, she would not have appointed him. She explained that the debtor and the lawyer appointed to represent the debtor in a Chapter 11 case have a fiduciary responsibility to *all* parties interested in the estate and may not favor one creditor over another. The judge opined that the accused's representation of Linda Smith in the Springhill case and of Teknetics in the bankruptcy case was a clear conflict of interest.

The testimony of the United States Trustee (UST) in this proceeding further suggests that the UST would have objected to the accused's appointment to represent Teknetics had he disclosed his representation of Linda Smith.

was a sham corporation without assets, inventory, employees, business or income, and that Sloan Smith had set up the other corporations to obtain Teknetics' property to defraud creditors.

The accused, on behalf of Teknetics, responded in opposition to Springhill's motion for relief from the automatic stay and alleged in part that Springhill was adequately protected by an "equity cushion," that the property in question was necessary for Teknetics' reorganization, that successful rehabilitation was probable, that granting Springhill its requested relief would cause irreparable damage to the Chapter 11 proceeding, that Springhill's claim on the property was a "sham," and that Springhill wrongfully held Teknetics' property for debts of a "related corporation."

At a hearing in November 1989, Combs appeared on behalf of Teknetics, asserting that the property that Springhill was holding belonged to Teknetics and denying that it was a sham corporation. He asked the bankruptcy court to deny Springhill's motion and to resolve any questions about Springhill's lien, asserting that the property was necessary to Teknetics' reorganization and that the bankruptcy law permitted Teknetics to avoid Springhill's lien. The bankruptcy judge ordered an evidentiary hearing to determine ownership of the assets.

At the evidentiary hearing in December, nobody from the accused's firm appeared on behalf of Teknetics.[11] At

---

[11] In this proceeding, the accused claims that his failure to appear at the hearing was "due to an error in calendaring." In his 1990 deposition in bankruptcy court, however, the accused had testified:

"I'd like to clarify what happened, because I mentioned to Judge Higdon on the phone the other day that I intentionally didn't appear for that hearing[.]

"* * * * *

"Mr. Webb [on behalf of Springhill] and I, as I mentioned earlier, had come to what I thought was an agreement, a settlement.

"Q: Before the hearing on the motion for relief?

"A: About three times before that hearing on the motion for relief.

"And it had been enough to where, okay, we've got it resolved. We'll get the paperwork done, and we did that before this hearing, about two weeks, maybe a week and a half.

"And Mr. Webb said, 'I think, you know, as far as I'm concerned, it's settled. I will talk to my client and we will resolve it before the hearing.' So the hearing in my mind was not going to occur."

the hearing, a representative of the United States Trustee's (UST) office advised the judge that, because of the way in which the Smiths had shifted assets among their various corporations, the UST would move to convert the Teknetics' case to a Chapter 7 liquidation. The UST also suggested that a Chapter 7 trustee possibly could make a claim on Teknetics' property. The UST asked the judge to grant Springhill's motion to lift the automatic stay, but not to allow any disbursements without further order of court.

Springhill then presented testimony from Tek's former general manager that the property belonged to Tek rather than to Teknetics, that Teknetics had closed down years before and then reopened as Tek, and that the property was being used by Tek in its business at the time it was seized by Springhill. He further testified that Tek had purchased the inventory, supplies, and saleable goods that Springhill was holding. As noted, the accused's firm failed to appear at the hearing and, thus, offered no opposing evidence. The bankruptcy court lifted the stay, commenting that, although Teknetics had had ample opportunity to avoid Springhill's landlord's lien under the bankruptcy code, it had failed to do so. The accused testified that he was surprised to learn that the stay had been lifted, but that he did not ask that court to reconsider its ruling.

In January 1990, the individual Smiths and the Smith corporations entered into a settlement agreement with Springhill, which provided that Springhill would have judgment for $55,000 against all defendants, including Teknetics, that the judgment was a lien on all property being held by Springhill, that no deficiency judgment would be entered, and that defendants had the right to purchase the property for $50,000 by February 5, 1990, or for $55,000 by April 15, 1990, at a private sale. Sloan Smith signed the agreement individually and as representative of Teknetics, Tek, and Overtrade. Linda Smith signed the agreement individually. The accused signed the agreement as the lawyer for all the parties except Springhill. The settlement was formalized by a stipulated judgment entered in the circuit court where the Springhill litigation was pending.

The accused did not notify the bankruptcy court or Teknetics' creditors (other than Linda Smith) that he was

trying to negotiate a settlement of the Springhill claim, nor did he seek the approval of the court once the settlement was reached. His first disclosure of the settlement to the bankruptcy court occurred on January 31, 1990. The accused later admitted under oath that there was no question but that he should have notified the bankruptcy court before entering into the settlement. The bankruptcy judge and other witnesses testified in the present proceeding that Teknetics, as debtor-in-possession, needed the bankruptcy court's permission to enter into the Springhill settlement.

The accused later assisted the Smiths in obtaining financing from First Texas Mfg. Co. (First Texas), a Texas corporation, for the reacquisition of Teknetics' property. Linda Smith then paid Springhill $50,000, after which the Smiths transferred title to First Texas. Aware that the property was being shipped to Texas, Teknetics' unsecured creditors expressed concern to the bankruptcy court.

In December 1989, the UST moved to convert the Teknetics' Chapter 11 proceeding to a Chapter 7 liquidation. The UST's motion alleged in part that a trustee was needed "to investigate the validity of the secured claim scheduled in favor of Linda O. Smith." The accused then moved to dismiss the Chapter 11 proceedings.

In March 1990, the bankruptcy judge converted the proceeding to a Chapter 7 liquidation. The judge stated that she did not have confidence in Sloan Smith's credibility; that Smith may have made misleading statements at the time of the initial filing as to whether Teknetics was operational; that Teknetics had failed to file the required monthly reports showing that it was not operational; that the financial affairs of the individual Smiths, Teknetics, and Tek were in conflict; and that the accused "has been representing both personal Smiths as well as [Teknetics], under circumstances where Mrs. Smith is admittedly a creditor of the corporation[,] that's a clear conflict of interest." The judge also questioned the validity of Springhill's landlord's lien and wondered why the accused, as lawyer for the debtor, had not taken steps to avoid the lien. The judge determined that a trustee was needed to explore those questions and to investigate the

transfer of the property to First Texas. The accused thereupon ceased to represent Teknetics in the bankruptcy proceeding.

The appointed trustee eventually brought a proceeding against the accused to recover money for the Teknetics estate. The accused entered into a $15,000 settlement with the estate and agreed to waive his attorney fees in Teknetics' bankruptcy. The trustee also proceeded against the Smiths individually, Tek, Springhill, and First Texas. The trustee was successful in obtaining other recovery totaling $75,000. Springhill's lien was voided, and the property that it was holding was recovered.

## ANALYSIS

### A. Polygraph evidence.

At trial, the accused attempted to offer polygraph evidence.[12] The Bar's objection to that evidence was sustained. The accused contends that the trial panel erred in excluding that evidence.

In an offer of proof, the accused presented the testimony of a polygraph examiner about the results of an examination that he had administered to the accused. During that examination, the accused was asked:

"At the time you filed that Application to Employ Attorney for Teknetics, were you trying to conceal your representation of Linda Smith?

"Did you deliberately try to conceal the Springhill Fuel judgment from the bankruptcy court?"

The accused answered both questions in the negative. The polygraph examiner opined that the accused was being truthful in answering those questions. The accused argues that evidence of his state of mind, as demonstrated by his answers to the quoted questions, is of relevance in determining whether his admittedly false statements contained in his "Application to Employ Attorney for Debtor and Certificate

---

[12] BR 5.1(a) provides:

"Trial panels may admit and give effect to evidence which possesses probative value commonly accepted by reasonably prudent persons in the conduct of their affairs. Incompetent, irrelevant, immaterial, and unduly repetitious evidence should be excluded at any hearing conducted pursuant to these rules."

of Disinterestedness" and "Verified Statement of Professional" were intentional, as argued by the Bar, or merely negligent, as he argues.

We conclude that this case does not offer a suitable opportunity to explore the general subject of the admissibility of polygraph evidence in Bar disciplinary proceedings. The issues before this court are whether the accused knowingly made a representation to the bankruptcy court that he knew to be untrue, and whether he intentionally failed to disclose a material fact to the court, while having that fact specifically in mind. Even if we considered the accused's offer of proof it would not assist the accused, because we still would find that his misrepresentations and failure to disclose were intentional.

### B. First cause of complaint.

■    In its first cause of complaint, the Bar alleges that the accused violated DR 5-105(E) (current client conflicts) by simultaneously representing Teknetics, the debtor-in-possession, in bankruptcy court and Linda Smith, the corporation's largest secured creditor. The Bar argues that the accused had an actual conflict of interest or, in the alternative, had a potential conflict of interest and failed to make the disclosures required by DR 5-105(F) (requiring full disclosure and consent where conflict is likely).[13] The accused responds that his representation of the Smiths and their corporations did not present a conflict of interest, despite Linda Smith's position as a secured creditor of Teknetics, because he believed that they were one entity rather than multiple clients and that their interests were aligned. This court has recently rejected a similar argument.

---

[13] DR 5-105(A) provides in part:

"(1) An 'actual conflict of interest' exists when the lawyer has a duty to contend for something on behalf of one client that the lawyer has a duty to oppose on behalf of another client.

"(2) A 'likely conflict of interest' exists in all other situations in which the objective personal, business or property interests of the clients are adverse. A 'likely conflict of interest' does not include situations in which the only conflict is of a general economic or business nature."

When a lawyer in a firm is required to decline employment because of a conflict of interest, all other members of the lawyer's firm are precluded from undertaking that employment. DR 5-105(G).

In *In re Cohen*, 316 Or 657, 853 P2d 286 (1993), the lawyer in question simultaneously represented a husband charged with abuse of his wife's daughter, as well as the wife in conjunction with a related juvenile matter. The accused argued that, because both the husband and the wife were trying to keep the family together, there was no actual conflict of interest. This court disagreed, stating:

> "The presentence report informed the accused that one of his clients, Wife, was taking active steps against his other client, Husband, which could—and later apparently did—have a prejudicial impact on Husband's legal interests. The accused knew, on reading the report in late August 1989, that he would be called on to contend for opposing resolutions of the pending matters on behalf of Husband and Wife. That was an actual conflict as defined in DR 5-105(A)(1). Nonetheless, the accused continued thereafter to represent Husband in the criminal case and Wife in the juvenile proceedings. In doing so, he violated DR 5-105(E)." 316 Or at 663.

As in *Cohen*, we are unable to conclude that, simply because certain parties may desire the same outcome, no conflict of interest exists. The key to the actual conflict in *Cohen* was that the lawyer in question "would be called on to contend for opposing resolutions of the pending matters" for different clients. *Id.* The same is true here.

The accused admits that, when he undertook to represent Teknetics, he knew that Linda Smith was Teknetics' principal secured creditor. He also knew that his associate Combs was representing the Smiths and their related entities in the Springhill case. The position taken by the accused in the Teknetics' bankruptcy case was directly in conflict with the position taken by the accused's firm in the Springhill case — that the property belonged to Linda Smith individually as a result of her foreclosure before the bankruptcy. Here, as in *Cohen*, the legal interests of the parties were in actual conflict.

As this court stated in *In re Jans*, 295 Or 289, 295, 666 P2d 830 (1983), it is "never proper for a lawyer to represent clients with conflicting interests no matter how carefully and thoroughly the lawyer discloses the possible effect and obtains consent." Although this court amended DR

5-105 after *Jans* was decided, the above-quoted principle still applies to situations of *actual* conflict.

The accused also argues that this court's cases finding current client conflicts of interest all have dealt with situations in which the accused lawyer represented clients in the same transaction. The accused is mistaken. *Cohen* involved separate proceedings. *See also In re Renn*, 299 Or 559, 704 P2d 109 (1985) (conflict of interest when lawyer simultaneously represented bankrupt debtor as well as one of debtor's creditors in a separate dissolution proceeding); *In re Hershberger*, 288 Or 559, 606 P2d 623 (1980) (conflict of interest when lawyer filed a foreclosure suit naming as defendants a husband and wife who the lawyer was representing in a bankruptcy proceeding).

We conclude that there is clear and convincing evidence in the record that the accused violated DR 5-105(E).

### C. Second cause of complaint.

The Bar's second cause of complaint is based on the accused's submission of two documents to the bankruptcy court regarding the accused's relationship with creditors or parties in interest in Teknetics' bankruptcy. Those documents affirmatively state that the accused and his law firm have no connection with any creditors or other parties in interest in the bankruptcy case.

The Bar first argues that the accused's conduct involved intentional misrepresentations in violation of DR 1-102(A)(3). The trial panel found that the accused did not submit the documents with a "knowing effort to mislead," but concluded:

> "[I]t is reckless behavior for an attorney to sign and file documents in court which deal with a material issue without reading them and with no sufficient basis for information to justify the representations contained therein."

Because we find by clear and convincing evidence that the accused intentionally made material misrepresentations to the bankruptcy court in both documents in order to further the Smiths' interests, we need not decide whether the state of mind of recklessness is sufficient to support a violation of DR 1-102(A)(3).

In *In re Hiller and Janssen*, 298 Or 526, 694 P2d 540 (1985), the accused lawyers submitted an affidavit that failed to disclose a material fact regarding a purported "sale." This court held that the fact that the lawyers had no subjective intent to deceive or commit fraud did not absolve them of the misrepresentation, which could take the form of non-disclosure. 298 Or at 533. A lawyer engages in misrepresentation if the lawyer has an undisclosed material fact in mind and knowingly fails to disclose it. *Id.* at 532.

The accused admitted before the trial panel that the documents signed and filed by him with the bankruptcy court were untrue. The accused is an experienced bankruptcy lawyer who certainly understood the crucial importance of disclosing his affiliation with Sloan Smith, Teknetics' principal and sole stockholder, and with Linda Smith, Teknetics' largest creditor. We conclude that there is clear and convincing evidence that the accused intentionally failed to disclose those relationships to the bankruptcy court as part of an ongoing course of conduct designed to benefit the Smiths. The accused thereby violated DR 1-102(A)(3).

The Bar next argues that, contrary to the decision of the trial panel, the accused's conduct in this matter also violated DR 7-102(A)(3) (a lawyer shall not conceal or knowingly fail to disclose that which the lawyer is required by law to disclose), DR 7-102(A)(5) (a lawyer shall not knowingly make a false statement of law or fact), and ORS 9.460(2) (a lawyer shall not seek to mislead a court by any artifice or false statement of law or fact).

We conclude that there is clear and convincing evidence in the record that the accused intentionally failed to disclose to the bankruptcy court facts that he was duty-bound to disclose, and that he affirmatively made statements that he knew were untrue. His ongoing course of conduct in that regard was part of an overall scheme to mislead the court and creditors in order to exploit the bankruptcy process and to further the Smiths' interests, in violation of DR 7-102(A)(3) and (5) and ORS 9.460(2).

## D. *Third cause of complaint.*

In its third cause of complaint, the Bar alleges that the accused violated DR 1-102(A)(4), by submitting inaccurate and misleading documents to the bankruptcy court, and that he violated both DR 1-102(A)(4) and DR 7-102(A)(3), by failing to reveal to the bankruptcy court his prior and ongoing relationships with the Smiths and the settlement with Springhill that he negotiated on behalf of Teknetics, the debtor-in-possession, and the Smiths and their entities. The trial panel found the accused not guilty of those charges. The Bar seeks a finding by this court that the accused is guilty as alleged in its third cause of complaint.

■ The accused argues that this court's case law requires proof of intent. He relies primarily on *In re Smith*, 316 Or 55, 848 P2d 612 (1993), and *In re Hedrick*, 312 Or 442, 822 P2d 1187 (1991). Those cases do not support the accused's argument. No intent requirement appears in the text of DR 1-102(A)(4). This court never has addressed the issue whether that rule contains an intent element. The focus of the rule is on the *effect* of a lawyer's conduct on the administration of justice, rather than on the lawyer's state of mind when the conduct is undertaken.

A lawyer violates DR 1-102(A)(4) by engaging in conduct that causes, or has the potential to cause, harm either to the procedural functioning of a judicial proceeding or to the substantive interest of a party to that proceeding. *In re Haws*, 310 Or 741, 745-48, 801 P2d 818 (1990). As used in the rule, "conduct" encompasses both doing something that one should not do and not doing something that one is required to do. *Id.* at 746. In *Haws*, this court interpreted the term "prejudice" to require either repeated conduct causing some harm or a single act causing substantial harm to the administration of justice. *Id.* at 748.

■ Here, the accused was required to disclose to the bankruptcy court, at the outset of Teknetics' bankruptcy, his connection to any creditor or adverse interest. He failed to do so. The accused's duty to disclose that information to the court was ongoing throughout the bankruptcy proceeding. As lawyer for the debtor-in-possession, the accused had a duty to appear at the hearing on Springhill's motion to lift the

automatic stay, but failed to do so. That was important, because he could have argued that Springhill's lien was voided by Teknetics' petition, and because he had a duty to protect Teknetics' assets for the benefit of *all* Teknetics' secured and unsecured creditors. It is in view of that ongoing course of conduct — all things the accused had a duty to do but failed to do — that we view the allegation that the accused's settlement of the Springhill case, without notice to or permission of the bankruptcy court or notice to Teknetics' other creditors, prejudiced the administration of justice before the bankruptcy court.[14]

The accused's course of conduct also affected the procedural functioning of Teknetics' bankruptcy. First, had the accused disclosed to the bankruptcy court and to the other creditors the connection between his firm and the Smiths, it is highly unlikely that he would have been appointed as Teknetics' lawyer in the bankruptcy. Moreover, his efforts to settle the Springhill case on behalf of both Teknetics and Linda Smith, its largest creditor (to the detriment of other creditors of the bankruptcy estate to whom the accused owed a fiduciary duty), prejudiced the bankruptcy proceeding. His failure to appear at the December 1989 hearing caused the bankruptcy court to lift the automatic stay of the Springhill case, because the court found that the property belonged to Tek rather than Teknetics — a factual premise that the accused knew to be incorrect. The result of the accused's course of action was to derail the Chapter 11 proceedings.

That conclusion is not merely speculation on our part, but is supported by the fact that, largely due to the accused's actions on behalf the Smiths, the Teknetics bankruptcy was converted into a Chapter 7 liquidation. A trustee had to take steps to undo the Springhill settlement and the shipment of the property to Texas in order to recover the

---

[14] In his 1990 deposition in bankruptcy court, the accused agreed that "[t]here's no question there should have been [bankruptcy] court approval for that [settlement]." The accused now argues that it is unclear under bankruptcy law whether he was required to seek the bankruptcy court's approval to enter into the Springhill settlement. In this proceeding, the bankruptcy judge, as well as other witnesses on behalf of the Bar, opined that the court's permission was necessary, because Teknetics, a debtor-in-possession, was a signatory to the Springhill settlement.

assets for the bankrupt estate. The accused's course of conduct — in addition to prejudicing the procedural functioning of the bankruptcy court — affected the substantive interests of parties, most notably Teknetics' unsecured creditors, to whom the accused owed a fiduciary duty. We conclude that clear and convincing evidence in the record supports a conclusion that, beginning with his failure to disclose to the bankruptcy court the nature of his relationship with the Smiths and culminating in his settlement of the Springhill case without notice to or consent of the bankruptcy court, the accused's conduct prejudiced the administration of justice in violation of DR 1-102(A)(4).

■ Regarding the Bar's allegation that, by failing to disclose to the court the settlement of the Springhill case, the accused violated DR 1-102(A)(4) and DR 7-102(A)(3) (knowingly failing to disclose that which a lawyer is required by law to reveal), we are persuaded that the Bar has proved by clear and convincing evidence that the accused intentionally failed to disclose the settlement and that he was required by law to do so. The bankruptcy court had a right to know, and the accused had a duty to disclose, that he had settled Teknetics' dispute with Springhill. Thus, a violation of DR 7-102(A)(3) has been established.

## SANCTION

■ We turn, to the question of sanction. In determining the appropriate sanction for ethical misconduct, this court looks to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (ABA Standards) and Oregon case law. The court considers (1) the ethical duty violated, (2) the lawyer's mental state, (3) the potential or actual injury caused by the misconduct, and (4) the existence of aggravating or mitigating factors. *In re Dickerson*, 322 Or 316, 324, 905 P2d 1140 (1995).

■ Regarding the ethical duties violated, the ABA Standards state that the most important ethical duties are the obligations that a lawyer owes to clients. ABA Standards at 5. The first of those duties is the duty of loyalty, which includes the duty to avoid conflicts of interest. *Id.* In the present case, the accused violated that duty by representing

both Linda Smith and the Teknetics bankruptcy estate in the circumstances detailed above, which we have held to involve an actual conflict of interest.

A lawyer also owes duties to the legal system. One such duty is to avoid conduct prejudicial to the administration of justice and to refrain from conduct involving misrepresentations. ABA Standards at 5. The accused violated those duties by intentionally undertaking an ongoing course of conduct that interfered with the administration of justice in the bankruptcy court's proceedings. He intentionally misrepresented some facts and intentionally failed to disclose other facts that he had an ethical duty to disclose to the bankruptcy court.

The second consideration is the lawyer's mental state. The accused intentionally undertook to represent Teknetics, as debtor-in-possession, despite the fact that he and his firm were simultaneously representing the Smiths and their related entities. The accused also acted intentionally when he failed to make appropriate disclosures to the bankruptcy court and filed documents containing false representations.

The court next considers the actual or potential harm involved, which may be measured by examining the extent of any harm to a client, or by evaluating the level of interference with a legal proceeding. ABA Standards at 6. For a sanction to be imposed, the harm need not be actual, only potential, because the primary purpose of the disciplinary process is to protect the public. ABA Standards at 25.

The conduct of the accused in this case caused actual harm to Teknetics' bankruptcy estate. The accused's misrepresentations misled the bankruptcy court into appointing him as the lawyer for the debtor. That raised the possibility, if not the actuality, of damage to creditors other than Linda Smith. Such favored treatment may, in fact, have occurred in connection with the Springhill settlement. That settlement was accomplished without notice to the other creditors, and Teknetics' assets, which the accused valued at $325,500 in the bankruptcy court, were later sold to Linda Smith for $50,000. The settlement eventually was set aside, causing delay and additional expense to the bankruptcy

estate. The accused agreed to pay the bankruptcy estate $15,000 and to relinquish his claim for attorney fees. The Professional Liability Fund paid additional sums on his behalf. The bankruptcy trustee was also successful in recovering other assets — totaling $75,000 — from the Smiths, Springhill, and others.

We next turn to aggravating and mitigating factors. Aggravating factors include a pattern of misconduct in failing to deal appropriately with the conflict between the Smiths and Teknetics, multiple offenses, and the accused's substantial experience in the practice of law. ABA Standard 9.22 (c), (d), and (i).

The accused's conduct is also aggravated by the fact that he has changed his story. *See In re Melmon*, 322 Or 380, 386, 908 P2d 822 (1995) (the accused "changed her story"); *In re Boyer*, 295 Or 624, 630, 669 P2d 326 (1983) (an accused's lack of credibility before a trial panel is a proper consideration in fixing a sanction for misconduct). For example, in 1990, the accused testified that he was not aware of the June 6 letters drafted by Combs or of their intended purpose and that he was not personally involved in any discussion of that course of action. In 1994, however, he testified in a deposition that he *was* aware in 1990 that Combs would take that course of action. Before the trial panel, he testified that he knew that Combs was writing letters in the Springhill case but that he did not know their contents. Concerning his failure to appear at the December 1989 hearing in bankruptcy court, the accused testified that he did not appear because he believed that the matter had been settled with Springhill's lawyer. Later, however, he testified that he did not appear because the hearing had not been calendared by his office.

In mitigation, we note that the record here does not show that the accused has any prior disciplinary record, that he cooperated with this disciplinary proceeding, and that other penalties or sanctions have been imposed. ABA Standard 9.32 (a), (e), and (k).

Given the duties violated, the extent of the actual or potential injury, the presence of aggravating and mitigating circumstances, the following ABA Standards apply:

"4.32 Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client."

"6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding."

In this case, the conflict of interest was compounded by the documents filed by the accused, which prevented the bankruptcy court from discovering the existence of the conflict. In cases involving the filing of false affidavits or certifications by lawyers, the sanction is typically a substantial suspension. *See In re Brown*, 298 Or 285, 297, 692 P2d 107 (1984) (serious misconduct involved in the "preparation of a false affidavit" warranted two-year suspension). Other Oregon cases involving the preparation or filing of false documents include *In re Benson*, 317 Or 164, 854 P2d 466 (1993) (assisting client in preparation of fraudulent promissory notes and trust deeds warranted six-month suspension); *In re Dinerman*, 314 Or 308, 840 P2d 50 (1992) (false representations in promissory note and security agreement in order to obtain straw loan for client warranted 63-day suspension); *In re Hedrick* (misrepresentation in probate petition that a will was testator's last will, and other disciplinary offenses warranted two-year suspension); and *In re Hiller and Janssen* (failure to disclose material facts in submissions to the court warranted four-month suspension).

The accused, an experienced bankruptcy lawyer, engaged in aggravated multiple client conflicts of interest, intentionally submitted documents to the bankruptcy court that he knew were untrue (thereby preventing the court from discovering his conflicts of interest), and repeatedly failed to disclose material information to the court that he had a duty to disclose. His ongoing conduct was in furtherance of his goal to advance the interests of his *de facto* clients, the Smiths, at the expense of the debtor, the client he purported to represent, and the debtor's creditors (other than Linda Smith). He sought to misuse the bankruptcy process on behalf of the Smiths. His conduct presented the probability that the bankruptcy court would be seriously misled,

as in fact it was. Under the ABA Standards and this court's cases, we conclude that the appropriate sanction is a substantial suspension.

The accused is suspended from the practice of law for one year.