Argued and submitted November 4, 1997; reassigned April 3, resubmitted June 11, accused suspended for six months commencing 60 days from November 13, 1998, reconsideration denied February 9, 1999

In re Complaint as to the Conduct of

# TERESE M. GUSTAFSON,
*Accused.*

## (OSB 95-34; SC S43937)

968 P2d 367

Martha M. Hicks, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the briefs for the Oregon State Bar.

James N. Westwood, of Miller, Nash, Wiener, Hager & Carlsen LLP, Portland, argued the cause and filed the brief for the accused.

Before Carson, Chief Justice, and Van Hoomissen, Durham, and Leeson, Justices.*

PER CURIAM

Durham, J., concurred and filed an opinion.

---

\* Fadeley, J., retired January 31, 1998, and did not participate in this decision; Graber, J., resigned March 31, 1998, and did not participate in this decision; Gillette and Kulongoski, JJ., did not participate in the consideration or decision of this case.

## PER CURIAM

In this lawyer discipline proceeding, the Oregon State Bar (the Bar) seeks reversal of a decision by a trial panel of the Disciplinary Board. Rule of Procedure (BR) 10.5(a). The Bar alleges that the accused violated Disciplinary Rule (DR) 1-102(A)(3) (conduct involving dishonesty, fraud, deceit, or misrepresentation) and DR 1-102(A)(4) (conduct prejudicial to the administration of justice) (two counts). The trial panel concluded that the Bar failed to prove that the accused violated the disciplinary rules as charged and dismissed the Bar's complaint.

■■ This court reviews the trial panel's decision *de novo*. ORS 9.536(3); BR 10.6. The Bar has the burden of establishing misconduct by clear and convincing evidence. BR 5.2. On *de novo* review, we conclude that the accused is guilty of violating the disciplinary rules as charged. We further conclude that a six-month suspension is the appropriate sanction.

### FINDINGS OF FACT

The following facts have been established by clear and convincing evidence. The accused was admitted to practice law in Oregon in 1981. From 1981 until March 1996, the accused was a deputy district attorney in Clackamas County.[1] The charges against the accused stem from her prosecution of a juvenile case in 1993 and 1994. That case began in late 1992, when two preschool-aged girls told their parents that a teenage boy in their neighborhood (the juvenile) had molested them. Later, the girls stated that the juvenile's parents also had molested them. A juvenile delinquency petition was filed against the juvenile in Clackamas County Juvenile Court, and a grand jury returned indictments against the parents in Clackamas County Circuit Court.

The accused, who then was a senior deputy district attorney, was assigned to prosecute the parents (the adult cases). The case against the juvenile (the juvenile case) was

---

[1] The accused was elected to the office of Clackamas County District Attorney in May 1996 and took office in January 1997, after the trial panel issued its decision in this case.

assigned to Deputy District Attorney Kolbe. Matasar represented the juvenile, and Houze and Bowman represented the father and mother, respectively.

In December 1993, the accused replaced Kolbe as the prosecutor in the juvenile case. The accused actively began working on the juvenile case in January 1994.

In April and May 1994, a court hearing was held in the adult cases to address alleged discovery violations by the state. Judge Selander presided over the hearing, which took place between April 12 and May 20, 1994. On April 13, 1994, Matasar testified for the defense at that hearing, relating difficulties that he had encountered in obtaining discovery from Kolbe in the juvenile case.

During that time, Matasar continued to investigate and prepare the defense in the juvenile case. On April 18, 1994, he interviewed one of the state's principal witnesses, Dr. Bays, who had examined the two victims and diagnosed them as having been physically and sexually abused. Matasar met with Bays to learn more about her diagnosis and its basis. To that end, Matasar asked Bays questions about her diagnostic techniques. During the interview, Bays believed that the tone of the interview shifted from informational and conversational to confrontational—similar to what she had experienced during cross-examinations in court cases. For example, Matasar asked Bays whether she was sure about her diagnosis and, if so, why. During the latter half of the interview, Matasar told Bays that the juvenile had passed a polygraph test and a penile plethysmograph test. After the interview, Bays called the accused and asked whether the juvenile had passed those tests. She also told the accused that Matasar had been "pushy" about his client's innocence.

On April 20, 1994, Matasar returned to the courthouse to observe the continuing hearing in the adult cases. Because the court had excluded witnesses from the hearing, and Matasar had been a witness, Houze called the court's attention to Matasar's presence in the courtroom, stating that he would not be recalling Matasar as a witness for the defense. The accused responded:

"Your Honor, I might like to call him as a witness. I am very disappointed that he won't be called as a witness. I have some information that I think that may be relevant to this case, that I just discovered, regarding Mr. Matasar."

Judge Selander then excluded Matasar from the courtroom.

In order to ascertain the "information" to which the accused had referred, Matasar telephoned the accused that afternoon.[2] The accused refused to tell him what information she had referred to, stating that it could be used for impeachment purposes. She also stated that she did not expect to use that information if Matasar testified for the state in the adult cases, but that she expected to use it if he testified for the defense. The accused made other statements, discussed in greater detail later in this opinion, that led Matasar to believe that the accused had threatened him with a possible criminal investigation and an ethical complaint to the Bar. By the end of their conversation, Matasar had agreed to testify for the state at the hearing in the adult cases, and the accused had agreed that she would not mention her impeachment information.

The possibility of a criminal investigation greatly concerned Matasar. Immediately after the telephone conversation with the accused, he called a lawyer, Marmaduke, for legal advice. Marmaduke agreed to represent Matasar. That afternoon, Matasar prepared a memorandum for Marmaduke that summarized his telephone conversation with the accused.

Marmaduke contacted then-Chief Deputy District Attorney Miller and then-Clackamas County District Attorney O'Leary. He asked both Miller and O'Leary if they would talk to the accused to determine the nature of her impeachment information concerning Matasar. Neither Miller nor O'Leary succeeded. However, the accused told O'Leary that the information was not criminal in nature. O'Leary, in turn, told Marmaduke that the information related to impeachment, but not to potential criminal charges.

_____

[2] The information to which the accused had referred was Matasar's conduct during his interview with Bays, although the nature of that information was not disclosed until after the Bar commenced its investigation.

Matasar, however, remained concerned about the accused's perceived threats. On May 10, 1994, Judge Selander held an in-chambers conference before any further testimony by Matasar at the hearing in the adult cases. During that conference, Marmaduke requested that the court order the accused to disclose her impeachment information and expressed Matasar's concern that that information could create a conflict of interest in Matasar's representation of the juvenile. The accused responded that she believed that Matasar knew what the impeachment information was, that she had told him that the information could be the basis, upon further investigation, for an ethical complaint or criminal charges, and that she had no desire to make an ethical complaint against Matasar or to cause an investigation of him. The accused also stated that she did not think that her impeachment information would interfere with Matasar's representation of the juvenile. Judge Selander refused to order the accused to disclose the information, stating that he did not know of any authority that would allow him to order the state to disclose possible impeachment information. He also observed that the information would not interfere with Matasar's duties in the juvenile case, because it related only to the adult cases.

The conference with Judge Selander did not alleviate Matasar's concerns. On May 17, 1994, he wrote to Judge Morgan, before whom the juvenile case was pending, and requested a conference to address his intention to withdraw from that case because of the accused's conduct. Matasar's letter stated that, upon review of the transcript of the May 10, 1994, conference before Judge Selander, his initial concern about the accused's threat of ethical or criminal charges was reinforced and that he now believed that his concern interfered with his ability to represent the juvenile effectively, thereby necessitating his withdrawal. Upon receiving Matasar's letter, Judge Morgan referred the matter to Judge Bagley, who scheduled a hearing for May 18, 1994.

The accused attended the May 18, 1994, hearing before Judge Bagley, but she neither was invited nor volunteered to speak. Matasar asked Judge Bagley to order the

accused to disclose her impeachment information and, ultimately, moved to withdraw as counsel for the juvenile, contending that the accused's threat of criminal and ethical charges had created a conflict of interest that prevented him from exercising his independent judgment. Judge Bagley took the matter under advisement.

After the May 18, 1994, hearing before Judge Bagley, Matasar spoke with Nickerson, a juvenile court counselor assigned to the juvenile case. Nickerson told Matasar that, earlier on May 18, 1994, before the hearing, she had asked the accused about the impeachment information regarding Matasar and whether it could affect the juvenile case. The accused had told Nickerson that the information indeed could come out during the trial in the juvenile case.

On May 19, 1994, Judge Bagley denied Matasar's motion to withdraw from the juvenile case by letter, reasoning that, because the threat of impeachment related only to the adult cases, there was an insufficient basis for Matasar's concern in the juvenile case. After receiving Judge Bagley's decision, Matasar prepared an affidavit, which Nickerson signed, relating Nickerson's May 18, 1994, conversation with the accused. He then submitted the affidavit to Judge Bagley, together with a motion for reconsideration. Judge Bagley denied the motion, based upon the uncertainty that the accused's information would affect the juvenile case.

Matasar then petitioned this court for a writ of mandamus, requesting, in part, that Judge Bagley be directed to allow him to withdraw as counsel for the juvenile. The accused filed an affidavit in that proceeding, acknowledging that she had told Nickerson that her impeachment information could affect the juvenile case. This court issued an alternative writ of mandamus. Thereafter, Judge Bagley allowed Matasar to withdraw.

The Bar filed an amended formal complaint against the accused in October 1995. The first cause of complaint charged the accused with violating DR 1-102(A)(4), arising from her April 20, 1994, telephone conversation with Matasar. The second cause of complaint charged the accused with violating DR 1-102(A)(3) and (4), arising from her failure to

disclose to Judge Bagley that the alleged impeachment information could affect the juvenile case.

## FIRST CAUSE OF COMPLAINT

■■ DR 1-102(A)(4) provides: "It is professional misconduct for a lawyer to * * * [e]ngage in conduct that is prejudicial to the administration of justice." In *In re Haws*, 310 Or 741, 746-48, 801 P2d 818 (1990), this court set out a three-part test for analyzing an alleged violation of DR 1-102(A)(4). First, we must determine whether an accused lawyer engaged in "conduct," by doing something that the lawyer should not have done or by failing to do something that the lawyer was supposed to do. *Id.* at 746. Second, we must determine whether that conduct occurred during the "administration of justice," that is, during the course of a judicial proceeding or another proceeding that "contain[s] the trappings of a judicial proceeding," such as those involving sworn testimony, perjury sanctions, and subpoenas. *Id.* at 747. That inquiry focuses upon the potential effect of a lawyer's conduct upon the functioning of a proceeding, as well as upon a party's substantive interest in the proceeding. *Ibid.* Third, we must consider the "prejudice" arising from the lawyer's conduct. Prejudice may arise from several acts that cause some harm to the administration of justice or from a single act that causes substantial harm to the administration of justice. *Id.* at 748; *see also In re Smith*, 316 Or 55, 58-61, 848 P2d 612 (1993) (applying test and concluding that lawyer's attempt to induce witness not to testify or to influence his testimony violated rule).

Our determination whether the accused violated DR 1-102(A)(4) during the April 20, 1994, telephone conversation with Matasar hinges upon whose trial panel testimony concerning that conversation was more credible. The accused testified that, in response to Matasar's question about whether her impeachment information had criminal or ethical implications, she had replied that the information could have ethical implications and, if investigated further, could be considered criminal. According to the accused, she did not consider the ethical or criminal implications of her impeachment information until Matasar broached the subject. However, during the May 10, 1994, conference with Judge Selander, the accused represented that she, not Matasar, was the

first to mention the possibility that Matasar had engaged in unethical conduct.

Matasar's testimony tracks his contemporaneously written account of the conversation in his memorandum to Marmaduke. According to Matasar, the accused told him that: (1) her impeachment information would "knock the socks off [him]"; (2) sharing her information "would take the zip out of [her] cross-examination"; and (3) her information concerned possible ethical violations and could lead to criminal charges. Matasar also stated that the accused had implied to him that she either would ask, or was considering asking, for a criminal investigation.

Two additional witnesses testified about the April 20, 1994, telephone conversation. The mother of the alleged victims, who was in the accused's office during the entire conversation, testified that she did not hear the accused say anything about criminal charges or an investigation, or an ethical complaint, and that the accused's demeanor was normal, not agitated. A victim's advocate, who also was in the accused's office during part of the conversation, testified that she did not hear the accused state that she was going to take any action against Matasar, but that the accused's demeanor seemed frustrated, irritable, and tense, and that her voice was intense, as if she were trying to control herself and remain calm.

Examining the above-described accounts of the April 20, 1994, telephone conversation, it is significant that the accused has given inconsistent accounts of that conversation. Further, the two witnesses who heard the accused's side of the conversation remember it differently. Consequently, we give little weight to the testimony of the accused, the victims' mother, or the victim's advocate.

In contrast, Matasar's testimony before the trial panel about the April 20, 1994, telephone conversation is consistent with and is supported by his contemporaneous written record of that conversation. Accordingly, we find Matasar's testimony and written account to be more credible.[3] We

---

[3] Generally, this court gives weight to a trial panel's credibility finding, even though the court reviews disciplinary cases *de novo. In re Starr*, 326 Or 328, 338

find that the accused effectively threatened Matasar with possible criminal and ethical charges during the April 20, 1994, telephone conversation.

We now apply the three-part test under DR 1-102(A)(4). Our first consideration is whether the accused engaged in inappropriate conduct in threatening Matasar with possible criminal and ethical charges, while also representing to him that her impeachment information would not come to light if he testified for the state in the adult cases.

The basis for the accused's threats was Matasar's conduct during his interview with Bays, as related to the accused by Bays. Bays testified before the trial panel that, although she thought that Matasar had been "pushy," he had not tried to persuade her to change her testimony or to convince her not to testify, and that she had shared that information with the accused. Bays also testified that Matasar's comments to her during their interview had not changed her diagnosis. The accused, on the other hand, testified alternatively that: (1) Bays had told her that Matasar had tried to persuade Bays to change Bays's testimony and; (2) Bays had not told her that Matasar had tried to change Bays's testimony, but she thought that Matasar could have been trying to do so.

■ In evaluating the foregoing testimony, we give greater weight to Bays's account than to the accused's inconsistent accounts. We conclude that the information that Bays related to the accused concerning Bays's interview with Matasar did not constitute grounds for threatening Matasar with criminal or ethical charges. On this record, we cannot say that Matasar harassed or improperly attempted to influence a witness, or that the accused had a basis to believe that he had done so. Thus, the accused's threats of criminal and ethical charges stemming from Matasar's conversation with Bays lacked any basis in fact.

---

n 1, 952 P2d 1017 (1998). In this case, however, the trial panel did not make any credibility finding in respect of the testimony and evidence concerning the April 20, 1994, telephone conversation.

Further, even if the accused's threats were supported by evidence that Matasar indeed had engaged in criminal or unethical conduct, it still would have been inappropriate for the accused to use such threats to pressure him to testify for the state, but not for the defense, in the adult cases. *See generally* DR 7-102(A)(1) (in a lawyer's representation of a client or in representing the lawyer's own interests, the lawyer shall not take action in behalf of the lawyer's client when the lawyer knows, or it is obvious, that such action would serve merely to harass or maliciously injure another person); DR 7-105(A) (a lawyer shall not threaten criminal charges to obtain an advantage in a civil matter unless the lawyer reasonably believes the charge to be true and the lawyer's purpose is to compel or induce the other person to take reasonable action to make good the wrong that is the subject of the charges).

In short, particularly in the context of a deputy district attorney addressing a criminal defense lawyer, we conclude that the accused's threats, made without lawful justification, constituted "conduct" in which a lawyer should not engage under DR 1-102(A)(4).

■ Turning to the second part of the test under DR 1-102(A)(4), there can be no dispute that the accused's conduct occurred during the administration of justice. The April 20, 1994, telephone conversation took place during the ongoing hearing in the adult cases and while the juvenile case was proceeding simultaneously. The accused's conduct could have affected the procedural functioning of the justice system and the substantive interest of her client, the state, as well as the clients of Matasar, Houze, and Bowman.

■ Our final inquiry under DR 1-102(A)(4) is whether the accused's single act of threatening Matasar during the April 20, 1994, telephone conversation caused substantial harm to the administration of justice. It did. As a result of those threats, Matasar requested separate hearings before different trial judges[4] and ultimately withdrew from the juvenile case on the eve of trial, which delayed the trial for almost

---

[1] Our review of the record demonstrates that, in seeking judicial action, Matasar did not overreact to the accused's conduct.

one year and required the juvenile's family to retain other counsel at substantial, additional cost. From those facts, we conclude that the accused's single act resulted in prejudice by causing substantial harm to the administration of justice under DR 1-102(A)(4). *See In re McKee*, 316 Or 114, 126, 849 P2d 509 (1993) (single misrepresentation that caused case to be dismissed caused substantial harm under DR 1-102(A)(4)); *Smith*, 316 Or at 60 (single act of threatening witness violated DR 1-102(A)(4)). Accordingly, we find the accused guilty of the first cause of complaint.

### SECOND CAUSE OF COMPLAINT

In its second cause of complaint, the Bar charges that the accused violated DR 1-102(A)(3) and (4). DR 1-102(A)(3) provides: "It is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." The Bar contends that the accused made a misrepresentation by nondisclosure when she failed to inform Judge Bagley during the May 18, 1994, hearing that her impeachment information regarding Matasar could affect the juvenile case. The Bar further contends that the accused made another misrepresentation by nondisclosure when, after receiving Judge Bagley's letter decision denying Matasar's motion to withdraw, which turned upon Judge Bagley's understanding that the impeachment information related only to the adult cases, she failed to correct Judge Bagley's false impression. The Bar also charges that the accused engaged in conduct prejudicial to the administration of justice by failing to make those disclosures.

DR 1-102(A)(3) requires, at the least, that a lawyer *knowingly* engage in misrepresentation. *In re Hiller*, 298 Or 526, 532, 694 P2d 540 (1985). Further, a misrepresentation under DR 1-102(A)(3) includes a knowing failure by a lawyer to disclose a material fact that the lawyer "had * * * in mind." *Ibid.* Finally, a misrepresentation to a court by nondisclosure also may constitute conduct that is prejudicial to the administration of justice, in violation of DR 1-102(A)(4). *See In re Greene*, 290 Or 291, 297-98, 620 P2d 1379 (1980) (intentional failure to disclose information to probate court constituted misrepresentation under *former* DR 1-102(A)(4), now DR

1-102(A)(3), and conduct prejudicial to the administration of justice under *former* DR 1-102(A)(5), now DR 1-102(A)(4)).

The accused contends that she did not violate DR 1-102(A)(3), because she did not *knowingly* fail to disclose the nature of her impeachment information and because that information was not *material*. Our analysis thus turns upon a determination of those two issues.

We first examine our case law concerning the requirement that, in order to violate DR 1-102(A)(3), a lawyer, at the least, make a *knowing* misrepresentation. In *Greene*, the accused lawyer failed to advise a probate court about the ownership of property that would benefit from the expenditure of estate funds. In finding that the lawyer violated *former* DR 1-102(A)(4), now DR 1-102(A)(3), this court stated:

> "We find that Greene intentionally failed to advise the court that the property being purchased was then owned by the conservator. The more difficult question is whether such intentional failure to inform the probate court of the nature of the real estate investment arose because of Greene's ignorance of the necessity for such disclosure or was deliberate. We further find that the failure to properly advise the court was deliberate. Greene had worked as a probate clerk in this very court and he was aware of the need for disclosure to the court when the conservator was using conservatorship funds to deal with herself in her personal capacity."

*Greene*, 290 Or at 298. As can be seen, the court in *Greene* conducted a two-step inquiry to determine whether an accused lawyer knowingly had engaged in misrepresentation. First, the court determined that the lawyer knew that he was making a misrepresentation, which encompasses nondisclosure. Second, the court determined that the lawyer knew that the information at issue was material. Thus, in the context of misrepresentation by nondisclosure under DR 1-102(A)(3), the "knowing" element requires that the accused lawyer know both that the lawyer is failing to disclose information that the lawyer has in mind *and* that that information is material to the case at hand.

■ As noted, DR 1-102(A)(3) prohibits a knowing failure to disclose *material* information. *Hiller*, 298 Or at 532. Our case law demonstrates that, in the context of DR 1-102(A)(3), material information is information that, if it had been known by the court or other decision-maker, would or could have influenced the decision-making process significantly. For example, in *Hiller*, 298 Or at 529-31, the accused lawyers had filed a motion for summary judgment, the success of which depended upon whether a particular real estate sale had occurred. The lawyers submitted an affidavit in support of their motion, representing that the "sale" had occurred, without informing the court that the "sale" was only a *pro forma* transaction and that there was an agreement for the buyer to reconvey the property at a minimal price. In finding the lawyers guilty of violating *former* DR 1-102(A)(4), now DR 1-102(A)(3), this court observed that the character of the "sale" was a material fact that was indispensable to the summary judgment determination and that, if known, might have caused the court to regard the sale with skepticism. *Id.* at 532. Similarly, in *Greene*, 290 Or at 295, this court noted that, had the probate court known about the information that the accused lawyer had withheld, that court would not have approved the lawyer's request to expend conservatorship funds. *See also In re Leonard*, 308 Or 560, 567-69, 784 P2d 95 (1989) (failure to disclose true impact of lease interlineation that, had it been known, would have prevented other signatories from initialing lease, constituted nondisclosure of material fact); *In re Hedrick*, 312 Or 442, 446, 822 P2d 1187 (1991) (failure to disclose existence of second will in probate petition constituted nondisclosure of material fact).

■ Against that background, we examine the facts of this case to determine whether the accused knowingly failed to disclose a material fact that she had in mind and that she knew to be material. The undisclosed fact here is that the accused's impeachment information regarding Matasar could have affected the juvenile case.

The proceeding at issue is the May 18, 1994, withdrawal hearing in the juvenile case before Judge Bagley. The accused attended, but did not speak, at that hearing. However, just before the hearing, she had told Nickerson that her impeachment information could affect the juvenile case.

Thus, it is clear that the accused had the undisclosed fact in mind and knew that she did not disclose it during the hearing.

Further, it is apparent that the undisclosed fact was material and that the accused knew of its importance. During the May 18, 1994, hearing before Judge Bagley, Matasar expressed his concern that the accused's impeachment information would affect the juvenile case, thereby interfering with his representation of the juvenile:

> "* * * [The juvenile's parents] don't want to have a lawyer for their son whose objectivity has been compromised. They don't want to have a lawyer for their son who cannot exercise independent judgment because he is concerned about what the prosecutor is going to do to him instead of being concerned about how to make sure that their son is acquitted of these serious charges."

Also at that hearing, Judge Bagley stated that he would review the transcript from the May 10, 1994, conference before Judge Selander before making his decision. At that conference, both the accused and Judge Selander had emphasized that the accused's impeachment information related only to the adult cases. The accused had told Judge Selander that she had informed Matasar, after the April 20, 1994, telephone conversation, that she "intended to use him [in the adult cases] only to ask him questions about his relationship with * * * Kolbe." She also had stated to Judge Selander:

> "I don't have any concerns about Mr. Matasar and his representation in this case of his client. He indicated to me on the phone during the lunch hour that maybe he should not represent [the juvenile]. I told him that I didn't think that things would get to that point."

In deciding not to compel the accused to disclose that information, Judge Selander also distinguished between the adult and juvenile cases:

> "* * * [A]t this point, with all due respect to Mr. Matasar, who has represented [the juvenile] at this point, he simply is a witness [in the adult cases] like everybody else, and I am going to treat him like that. If it gets into his representations, or conversations with or communications

with his client, then we're going to stop it, because that's not what this is all about."

The distinctions made by Judge Selander and the accused between the adult and juvenile cases underscore the materiality of the fact withheld from Judge Bagley by the accused, *i.e.*, that her impeachment information could have affected the juvenile case. The accused was present at the hearing before Judge Bagley and the conference with Judge Selander, and had contributed to the impression that her impeachment information related only to the adult cases. She therefore cannot argue persuasively that she was unaware of the significance of the fact that her information also could have affected the juvenile case.

In sum, we conclude that the accused knowingly failed to disclose a material fact that she had in mind at the May 18, 1994, hearing before Judge Bagley and that the accused knew that the fact that she had withheld was material. Accordingly, we conclude that, by knowingly failing to disclose a material fact to the court, the accused made a misrepresentation in violation of DR 1-102(A)(3).

 The Bar also contends that the accused made another misrepresentation, in violation of DR 1-102(A)(3), when she failed to correct Judge Bagley's false impression that her impeachment information related only to the adult cases, as evidenced by his May 19, 1994, letter decision denying Matasar's motion to withdraw from the juvenile case. The Bar correctly asserts that a lawyer's failure to correct a false impression created by a nondisclosure of a material fact to a court constitutes misrepresentation under the rule. *See In re Boardman*, 312 Or 452, 457, 822 P2d 709 (1991) (failure to correct false impression created by unintentional misstatement of material fact constitutes misrepresentation).

In his May 19, 1994, letter decision, Judge Bagley stated:

"[The accused's] statements regarding Mr. Matasar were in the context of his testimony as a witness on discovery matters being heard by Judge Selander in [the adult cases]. The claimed information related only to Mr. Matasar's conduct in the [adult] case[s]. Viewed in this context, it does not

appear that Mr. Matasar's representation of the [juvenile] will or is likely to be affected by his personal interests."

(Internal quotation marks omitted.) In light of our conclusion that the accused violated DR 1-102(A)(3) by failing to disclose a material fact at the May 18, 1994, hearing, it follows that her later failure to correct Judge Bagley's false impression when she could have done so also violated that rule. As we have explained, the undisclosed fact—that the accused's impeachment information could have affected the juvenile case—could have influenced the decision-making process significantly.

■ We turn to the Bar's final contention—that, in failing to disclose to Judge Bagley that her impeachment information could have affected the juvenile case and in failing to correct Judge Bagley's false impression about that possibility, the accused engaged in conduct prejudicial to the administration of justice in violation of DR 1-102(A)(4). We agree with the Bar that the accused engaged in "conduct" under the rule, because she did not do something that she should have done. We also agree that that conduct occurred during the administration of justice. Finally, we agree that the accused's misrepresentation by nondisclosure to Judge Bagley also prejudiced the administration of justice. The accused's nondisclosure led Matasar to move for reconsideration and also perpetuated the exposure of the juvenile case to delay. Further, as a result of the accused's nondisclosure, Matasar was required to continue to represent the juvenile, despite his apparent conflict of interest. In short, we conclude that the accused, by making misrepresentations by nondisclosure to Judge Bagley, engaged in conduct prejudicial to the administration of justice in violation of DR 1-102(A)(4).

## SANCTION

■ ■ To determine the appropriate sanction, we consider the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) and Oregon case law. *In re Starr*, 326 Or 328, 346, 952 P2d 1017 (1998). The ABA Standards require us to analyze the accused's misconduct in light of the following factors: (1) the duty violated; (2) the accused's mental state at the time of the

misconduct; (3) the actual or potential injury caused by the accused's misconduct; and (4) the existence of aggravating or mitigating circumstances. ABA Standard 3.0.

By misrepresenting facts to the court, the accused violated her duty to the public to maintain her personal integrity. ABA Standard 5.1; *see also Greene*, 290 Or at 297 ("Our experience has been [that] all judges regularly rely upon the candor, honesty and integrity of the lawyer in handling *ex parte* matters which are presented to them. * * * Judges must be able to rely upon the integrity of the lawyer."). As a deputy district attorney, the accused also violated her duty to maintain the public's trust when she engaged in conduct that was prejudicial to the administration of justice. ABA Standard 5.2. Finally, the accused violated her duty to the legal system to abide by its rules and to avoid interfering with the proper administration of justice. ABA Standard 6.1.

As to the accused's mental state, the Bar asserts that she acted with intent, that is, "the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. However, the record does not demonstrate clearly that the accused acted with the intent to achieve a particular result. Rather, we conclude that the accused acted with "knowledge," that is, "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result," *ibid.*, when she engaged in the misconduct at issue here.

Turning to the injury caused, the record reflects that the accused's misconduct caused actual injuries. The ABA Standards define injury as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct." *Ibid.* Here, Matasar was injured by having to retain counsel to defend himself and to devote his efforts to seeking to withdraw from a case in which he actively was preparing a defense. The juvenile suffered economic injury, because he had to pay Matasar and also had to retain new counsel at a cost of $20,000. Additionally, his trial was delayed for almost one year. Nor did the court system escape unscathed. The accused's misconduct created a need for additional hearings, the withdrawal of counsel in a pending juvenile case, and the delay of a highly contentious and publicized trial.

Several aggravating factors are present. First, in threatening Matasar with criminal and ethical charges without lawful justification, the accused acted with a selfish motive. ABA Standard 9.22(b). She also has substantial experience in the practice of law. ABA Standard 9.22(i).

Another aggravating factor is the accused's lack of candor in the disciplinary proceedings. *See* ABA Standard 9.22(f) (false statements or other deceptive practices during the disciplinary process is an aggravating factor); *see also In re Claussen*, 322 Or 466, 486, 909 P2d 862 (1996) (citing lawyer's inconsistent accounts of his actions as aggravating factor). For example, as discussed earlier, *see* 327 Or at 645, before the trial panel, the accused offered inconsistent accounts of her telephone conversation with Bays, following Bays's interview with Matasar.

An additional aggravating factor is Matasar's vulnerability as a defense lawyer being threatened by a prosecutor. *See* ABA Standard 9.22(h) (vulnerability of victim is an aggravating factor). This court does not view threats of a possible criminal investigation originating from a deputy district attorney as empty gestures, because a deputy district attorney is in a unique position to initiate and pursue a criminal investigation. Indeed, at the trial panel hearing, the accused and other deputy district attorneys acknowledged the sensitivity of the criminal defense lawyer's role in the justice system and the significant impact of a prosecutor's threat to initiate a criminal investigation against a defense lawyer.

In mitigation, the accused has no prior disciplinary record. ABA Standard 9.32(a).

In light of the duty violated, the accused's mental state, the injuries caused, and the multiple aggravating factors, which outweigh the sole mitigating factor, the ABA Standards suggest that suspension would be appropriate here. *See* ABA Standard 6.12 (suspension generally is appropriate when a lawyer knows that material information improperly has been withheld and takes no remedial action, causing injury to a party or an adverse effect upon the legal proceeding). The Bar recommends a suspension of not less than one year. However, our case law suggests that a shorter suspension is appropriate here.

In *Greene*, 290 Or 291, this court imposed a 60-day suspension upon a lawyer who violated *former* DR 1-102(A)(4) and (5), now DR 1-102(A)(3) and (4), among other violations, by intentionally failing to disclose a material fact to a probate court. Similarly, in *In re Jones*, 326 Or 195, 951 P2d 149 (1997), this court imposed a 45-day suspension upon a lawyer who violated DR 1-102(A)(3) and (4) by knowingly having a client sign blank bankruptcy documents that contained perjury clauses and then filing those documents with the court. Further, in *Smith*, 316 Or. 55, this court imposed a 35-day suspension upon a lawyer who violated DR 1-102(A)(4) by threatening a potential witness. In each of those cases, this court moderated the sanctions due to multiple mitigating factors.

In contrast, and in the absence of any mitigating factor, the two accused lawyers in *Hiller*, 298 Or 526, each received a four-month suspension for violating *former* DR 1-102(A)(4), now DR 1-102(A)(3), as well as a related statute, by knowingly failing to disclose material facts to a court. Additionally, in *Claussen*, 322 Or 466, which involved both aggravating and mitigating factors, this court suspended the accused lawyer for one year for violating a statute and multiple disciplinary rules, including DR 1-102(A)(3) and (4).

Unlike the cases involving lesser sanctions, there is only one mitigating factor present in this case. Given the presence of one mitigating factor, the most similar case to the one at bar is *Hiller*. There, the court imposed a four-month suspension upon two lawyers found guilty of making a misrepresentation to the court by nondisclosure, in addition to a related statutory violation, in the absence of any identified aggravating or mitigating factor. Here, in addition to making a misrepresentation to the court, the accused engaged in conduct prejudicial to the administration of justice. Further, the accused's conduct resulted in significant injury to the criminal justice system, and, as a lawyer and a deputy district attorney, she violated her duties to the legal system and to the public. Finally, we note that the multiple aggravating factors in this case outweigh the one mitigating factor. The aggravating factors thus compound the gravity of the accused's misconduct and warrant a sanction greater than four months. However, compared to *Claussen*, the accused's

misconduct does not warrant a one-year suspension. We conclude, therefore, that a six-month suspension is the appropriate sanction in this case.

The accused is suspended from the practice of law for a period of six months, commencing 60 days from the date of filing of this decision.

**DURHAM, J.,** concurring.

I join in the court's conclusion regarding the accused's violation of disciplinary rules and the sanction imposed on the accused. I write separately to question the court's analysis of the requirement of prejudice in DR 1-102(A)(4).

DR 1-102(A)(4) forbids "conduct that is prejudicial to the administration of justice." On its face, that rule authorizes discipline if the Bar can prove, by clear and convincing evidence, BR 5.2, that the accused lawyer's conduct is "prejudicial," that is, harmful or injurious, to the administration of justice. Only conduct that causes genuine prejudice will suffice to establish a violation. The rule does not prohibit conduct that threatens only a potential or hypothetical injury to the administration of justice.

In *In re Haws*, 310 Or 741, 745, 801 P2d 818 (1990), this court stated that the text of DR 1-102(A)(4) is "simple and straightforward." I agree. The rule is uncomplicated by difficult phraseology, structure, or problems of internal inconsistency. However, in *Haws*, this court said that "[t]he problem arises in fairly determining the *amount* of harm or injury that triggers application of the rule." 310 Or at 747 (emphasis added). In attempting to address that perceived problem, the court chose

> "to interpret the word 'prejudice' in the context of this rule to require either:
>
> "1. Repeated conduct causing some harm to the administration of justice; *or*
>
> "2. A single act causing substantial harm to the administration of justice."

310 Or at 748 (emphasis in original). As a result of *Haws*, litigants in cases arising under DR 1-102(A)(4) typically wage costly battles over the questions whether the accused lawyer

engaged in a *single* act or *repeated* conduct that harmed the administration of justice and whether the Bar proved that "some" harm or "substantial" harm resulted.

With all due respect, I believe that *Haws* adopted a strained and incorrect reading of the rule. Nothing in the rule's text suggests that the lawyer's ethical responsibility under the rule should turn on whether the accused lawyer engaged in one or more than one culpable act. The rule's text also furnishes no support for the "some" harm versus "substantial" harm dichotomy that *Haws* created. The question that the prejudice element presents does not concern the *amount* of prejudice shown, as *Haws* states, but whether the Bar proved that the accused lawyer's conduct genuinely prejudiced the administration of justice.

*Haws* purported to justify the creation of those proof requirements by suggesting that they would reduce uncertainty in the rule's application. 310 Or at 748. I do not agree that the construction of DR 1-102(A)(4) adopted in *Haws* alleviates uncertainty. Although litigants readily may discern the line between a single act and repeated conduct by a lawyer in most cases, it oftentimes is difficult to establish which of several acts may have caused prejudice to the administration of justice. Moreover, the question whether a lawyer's conduct caused "some" harm or "substantial" harm to the administration of justice invites a purely subjective response. That test affords no assistance to lawyers who seek to conform their professional behavior to the rule's command and to Bar counsel who must investigate and prosecute rule violations. In my view, the rule interpretation adopted in *Haws* needlessly complicates the administration of DR 1-102(A)(4).

*Haws* also creates a gap in the rule's coverage. If the record of a disciplinary proceeding establishes that the accused lawyer engaged in a single act that was prejudicial to the administration of justice, but that the act caused only "some" harm (as opposed to "substantial" harm), the accused lawyer is entitled not to a reduced penalty but to exoneration. I cannot square that result with the unambiguous terms of DR 1-102(A)(4).

In a technical sense, the majority commits no error in declining to reexamine the tests for prejudice that *Haws* announced. No party before the court in this case argues for a

reevaluation of *Haws*. I, for one, am willing to entertain that argument in a future proceeding that raises the question of prejudice under DR 1-102(A)(4).

I concur.