Argued and submitted September 10, 1999, complaint dismissed November 9, 2000

# In re Complaint as to the Conduct of

## WILLIAM J. CLAUSSEN,
*Accused.*

## (OSB 96-107; SC S42174)

14 P3d 586

Gary M. Bullock, of Bullock and Regier, P.C., Portland, argued the cause and filed the brief for the accused. Daniel R. Reitman, filed the reply brief.

Mary A. Cooper, Assistant Disciplinary Counsel, Oregon State Bar, Lake Oswego, argued the cause and filed the response for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, a trial panel of the Disciplinary Board found that the accused lawyer, William J. Claussen, violated Code of Professional Responsibility Disciplinary Rule (DR) 1-102(A)(3) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation) and DR 7-102(A)(7) (prohibiting counseling or assisting client in conduct that lawyer knows is illegal or fraudulent). The Oregon State Bar (Bar) alleged that the accused violated those ethical rules while representing Jean Wilkinson in a bankruptcy proceeding. Specifically, the Bar contended that, in a letter that the accused sent to an insurance company, the accused misrepresented that federal bankruptcy law entitled Wilkinson to the cash surrender value of an insurance policy. The trial panel agreed with the Bar, imposed an eight-month suspension, and required the accused to retake the professional responsibility portion of the Bar examination. We review *de novo*. Bar Rule of Procedure (BR) 10.6. We conclude that the Bar has failed to prove by clear and convincing evidence that the accused violated either DR 1-102(A)(3) or DR 7-102(A)(7). Accordingly, we dismiss the Bar's complaint.

## I. FACTS

The following facts are undisputed. In 1984, Philip and Janette Cushman filed a nuisance action against Wilkinson. In June 1988, Wilkinson created a revocable living trust, with her ill mother as primary beneficiary and herself as trustee and contingent beneficiary. Wilkinson transferred some of her real estate holdings into that trust. In July 1988, the Cushmans obtained a judgment against Wilkinson.

In August 1988, Wilkinson, using proceeds from a loan secured by other property she owned, purchased a life insurance policy from Pacific Standard Life Insurance Company (Pacific) for $35,000. Wilkinson named the trust as beneficiary of that policy. Later that month, Wilkinson contacted the accused and asked him to file a bankruptcy proceeding for her. She was unable to file for personal reorganization under Chapter 13 of the United States Bankruptcy Code, 11 USC § 1301 *et seq.*, because her debt level was too high. Instead, in September 1988, she filed for reorganization

under Chapter 11 of the Code, 11 USC § 1101 *et seq.*, which usually is used by business entities. Although Wilkinson was a secretary, she listed her business in the bankruptcy petition as "Owning and Rental of Real Estate." She listed the life insurance policy in her schedule of personal property. In the schedule of property claimed as exempt, she listed "[l]ife insurance proceeds," the value of which she listed as "ALL." The total value of assets claimed in that schedule, however, was only $21,000. It is unclear whether that number included the assets referred to as "ALL."[1]

The filing of the bankruptcy petition prevented creditors from seizing Wilkinson's assets without the approval of the bankruptcy court. *See* 11 USC § 362(a)(2) (providing for stay of enforcement, against debtor or against property of estate, of judgment obtained before commencement of proceedings). On September 27, 1988, the Cushmans' lawyer deposed Wilkinson, and she testified that she had purchased the Pacific life insurance policy with the loan proceeds. The Cushmans did not object to the claimed exemption of the insurance policy in the bankruptcy proceedings.[2]

In November 1989, Wilkinson expressed to the accused her concern that Pacific was unstable financially and repeatedly asked him to assist her in transferring the life insurance policy to another company.[3] The accused advised Wilkinson to leave the policy with Pacific. Wilkinson then contacted Pacific and demanded a "maximum partial withdrawal" from the policy. Pacific paid her $8,600 before it recognized, apparently because the Cushmans previously had sent a letter to Pacific requesting information about the policy, that Wilkinson had filed bankruptcy.

---

[1] Unless the case is dismissed, property that is exempt in bankruptcy proceedings is not liable for debts incurred before the filing of the bankruptcy petition. 11 USC § 522(c). The parties' experts disagreed, however, whether Wilkinson had claimed the exemption properly in the petition.

[2] Unless a party objects, property that a debtor properly claims as exempt becomes exempt. 11 USC § 522(l).

[3] Wilkinson's concern was not without basis: Pacific went into conservatorship on December 11, 1989. The details surrounding the conservatorship, however, are not in the record.

On November 16, 1989, Pacific's lawyer, Liptak, advised the accused that Pacific would not release any additional funds unless the accused provided Pacific with a letter stating that there was no trustee in bankruptcy and that the withdrawal was in the ordinary course of business of the estate. Liptak also informed the accused that, alternatively, a discharge in bankruptcy or a court order would suffice to release the funds.

In November 1990, the Cushmans moved to dismiss the bankruptcy petition as having been filed in bad faith. They alleged that Wilkinson deliberately had hindered their attempts to collect on their judgment because, as she wrote in August 1986 (two years before the bankruptcy petition was filed), "if I lose the case and have to pay Cushman's [sic] money after the misery they cause Bob & I [sic], I'd give everything away to Charity before I could live seeing them with it." The Cushmans noted that, within 60 days of filing her bankruptcy petition, Wilkinson had encumbered other real property she owned and then used part of the loan proceeds to buy the insurance policy. They argued that Wilkinson had stated in her deposition that the policy "was intended to provide for care of her mother in the event [Wilkinson] died," but that her mother had died in the summer of 1989. They also alleged that she had engaged in other abuses of the bankruptcy process, including resisting court orders and making false statements on loan applications.

On January 11, 1991, the bankruptcy court heard the Cushmans' motion to dismiss. The accused participated by telephone. The court indicated that it would grant the motion, explaining:

> "The payment of the entire premium on the eve of bankruptcy, taken in the context of the debtor's other conduct, [and] an express declaration that she would rather give her assets to charity than allow the Cushmans to reach them, certainly suggests that the transfer was one element of her scheme to frustrate creditor's attempts to reach her assets."

That same day, Wilkinson again demanded that the accused help her obtain additional funds from her policy. She told him that she would retain the funds until the case was dismissed by final order. The accused was worried that he

might be liable to Wilkinson for not obtaining the additional funds as she had requested. He researched the issue that weekend.

On January 14, 1991, the accused sent the following letter to Pacific:

> "I represent the above named individual who is presently involved in a Chapter 11 proceeding in the U.S. Bankruptcy court in Portland, Oregon. This case is a non-trustee case and Mrs. Wilkinson is operating as a Debtor-in-Possession.
>
> "Mrs. Wilkinson is requesting that your company cancel her life insurance policy and surrender any unused premiums and/or cash value to her.
>
> "It appears to me that her request is in the ordinary course of business and is appropriate without applying to the Court for authorization."

The letter did not refer to the bankruptcy court's expressed intent to dismiss the bankruptcy proceedings. The accused, however, sent a copy of his letter to a representative of the United States Trustee's Office who had attended the hearing on the Cushmans' motion to dismiss. After the accused sent the letter to Pacific, Wilkinson appeared in Pacific's office in California and demanded the funds. Relying on the accused's letter, Pacific gave her a check for $29,753.52. Wilkinson later absconded with that money. At about the time that Wilkinson received the check from Pacific, the accused discovered that Wilkinson had deeded certain real estate to her boyfriend. The accused became upset and advised Wilkinson to reverse the transaction because he believed that it was fraudulent.

On January 18, 1991, the bankruptcy court entered an order dismissing Wilkinson's petition. A week later, Pacific received a writ of garnishment from the Cushmans. Pacific responded that the value of Wilkinson's policy at that time was $1,321.72. The Cushmans filed an action against Pacific. In August 1991, the California Attorney General's Office notified the Cushmans that a court had appointed the California Insurance Commissioner as Pacific's conservator and that the court's order prohibited any litigation against

Pacific without that court's consent. The Cushmans decided against proceeding further against Pacific. Thereafter, the accused lost contact with Wilkinson. In April 1991, he received permission to withdraw as her lawyer in the bankruptcy proceedings.

In October 1991, the Cushmans moved to reopen the bankruptcy proceedings and asked the court to impose sanctions on the accused based on his letter to Pacific. The bankruptcy court refused to reopen the case, stating:

> "On the issue of the fact when she went and got the money out of the insurance company using this letter from [the accused], there is no evidence that she dissipated the money during the pendency of the case. Maybe it caused question whether that was the ordinary course of business. But I don't think that there is anything clearly wrong with what occurred there. I don't think she had an obligation to arrange her affairs to make it easy for the Cushmans to execute after the case was dismissed."

The Cushmans' lawyer conceded that "it is possible that under further scrutiny that [the withdrawal] could have been in the ordinary course of business, even though it may have been a close call. But we just want that opportunity to present evidence on that particular issue." The court responded:

> "I guess I don't get what you are going to do with that. Because she had the cash. The insurance company gave her the cash. So she's holding the cash on the day the case gets dismissed. I mean, there is no evidence that the cash went anywhere, at least not what you gave to me. So what are you going to do with that information? What is the consequence of her taking that policy and turning it into cash? It is like she had a $27,000 asset, at one point it was in the form of a policy, next point it is in the form of cash, and then I dismissed the case. I don't understand.
>
> "* * * * *
>
> "In this case, the conduct consisted of [the accused] writing a letter expressing his opinion that the debtor, Chapter 11 Debtor-in-Possession, had the authority to take possession of the cash surrender value of the life insurance policy.
>
> "While there may be some dispute regarding the correctness of that conclusion, especially in view of the court's

ruling a few days earlier regarding dismissal, the Cushmans do not suggest that [the accused] did not reasonably believe that his opinion was correct.

"Accordingly, I do not believe that the integrity of the judicial process hinges upon whether [the accused] is punished for assisting his client in obtaining the cash surrender value of the policy.

"I believe that the Cushmans' understandable frustration in their unsuccessful collection efforts colors their perception, the propriety of the events. However, there is no legal obligation of a debtor to voluntarily surrender assets to a judgment creditor nor arrange their affairs to maximize the probability that the creditor's collection efforts will be successful.

"While the debtor reduced the surrender value of the policy to zero while the case was pending, she did not dissipate that asset while the case was pending. * * *

"I guess I find it quite persuasive here that all that happened was the surrender value was converted from one form to another."

In November 1995, the Cushmans complained to the Bar regarding the letter that the accused had sent to Pacific, asserting that the accused had acted dishonestly.

In October 1997, the Bar filed a formal complaint against the accused, charging him with violating DR 1-102(A)(3) and DR 7-102(A)(7). The Bar alleged two misrepresentations under DR 1-102(A)(3). First, "[t]he Accused's letter of January 14, 1991, was misrepresentative in that it failed to disclose that the bankruptcy had been dismissed, four days previously."[4] Second, "[t]he letter also misrepresented that the withdrawal was being made in the 'ordinary course of business.' " Further, "[t]he Accused made the above misrepresentations in an effort to assist his client to withdraw her assets from the insurance company, and thereby avoid the claims of her creditors." The Bar's complaint

---

[4] The Bar incorrectly assumed that the dismissal was effective when the bankruptcy court orally expressed its intent to dismiss the proceedings. In fact, the dismissal was not effective until an order was entered on January 18, 1991. See Fed R Bankr P 9021 (a judgment is effective when entered).

pleaded that the accused's letter to Pacific involved "dishonesty, fraud, deceit or misrepresentation" in violation of DR 1-102(A)(3) and that the accused assisted his client in conduct that he knew to be "illegal or fraudulent" in violation of DR 7-102(A)(7). As noted, the trial panel found that the accused had violated both rules, suspended him from the practice of law for eight months, and required him to pass the professional responsibility portion of the Bar exam before reinstatement. Because the suspension imposed was greater than six months, this court's review is automatic. ORS 9.536(2).

## II. ANALYSIS

■ The Bar has the burden of establishing misconduct by clear and convincing evidence. BR 5.2. "Clear and convincing evidence" means evidence establishing that the truth of the facts asserted is highly probable. *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985). Even though this court reviews disciplinary proceedings *de novo*, we give weight to a trial panel's credibility finding. *In re Trukositz*, 312 Or 621, 629, 825 P2d 1369 (1992). At the same time, the testimony of an accused lawyer, if this court deems it credible, can be sufficient to establish facts. *See In re Gildea*, 325 Or 281, 296, 936 P2d 975 (1997) (relying on testimony of an accused to establish a client's prior consent).

### A. *DR 1-102(A)(3)*

As noted, the Bar charged two misrepresentations under DR 1-102(A)(3). This court has noted that fraud, deceit, dishonesty, and misrepresentation overlap but are not identical concepts. *In re Starr*, 326 Or 328, 342, 952 P2d 1017 (1998). The Bar's theory is that the accused engaged in dishonesty, fraud, and misrepresentation in his letter to Pacific.

■ Dishonesty is a "[d]isposition to lie, cheat or defraud; untrustworthiness; lack of integrity." *In re Hockett*, 303 Or 150, 158, 734 P2d 877 (1987) (citation omitted). In *Hockett*, the court concluded that a lawyer's act of assisting a client's fraudulent transfers, done with the intent to cheat creditors, constituted dishonesty in violation of current DR 1-102(A)(3).

■ Misrepresentation under DR 1-102(A)(3) requires a knowing misrepresentation, which includes misrepresentation by nondisclosure. *In re Gustafson*, 327 Or 636, 647, 968 P2d 367 (1998). Evaluating misrepresentation involves a two-part inquiry: (1) whether the lawyer knew that the lawyer's statement was a misrepresentation; and (2) whether the lawyer knew that it was material. *Id.* at 648. A material misrepresentation involves information that, if the decision-maker had known of it, "would or could have influenced the decision-making process significantly." *Id.* at 649.

■ Fraud under DR 1-102(A)(3) is not synonymous with civil fraud. "A misrepresentation becomes fraud or deceit when it is intended to be acted on without being discovered." *In re Hiller*, 298 Or 526, 533, 694 P2d 540 (1985). Reliance is not required. *See In re Benson*, 317 Or 164, 169, 854 P2d 466 (1993) (success is not required; it is enough that the accused tried to mislead).[5] We turn to the circumstances of the alleged violations of DR 1-102(A)(3).

1.  *"Ordinary Course of Business"*

■ The accused's letter to Pacific stated in part that "[i]t appears to me that [Wilkinson's] request is in the ordinary course of business and is appropriate without applying to the Court for authorization." "Ordinary course of business" is a term of art in bankruptcy law that is not defined in the bankruptcy statutes or the legislative history. Generally, once a business is in bankruptcy, the trustee or the debtor-in-possession (here, Wilkinson) must apply to the bankruptcy court for permission to sell, lease, or use assets. *See* 11 USC § 363(b)(1) (requiring notice and a hearing). If a sale, lease, or use is in the ordinary course of business, however, notice and a hearing are unnecessary. *See* 11 USC § 363(c)(1) ("unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in

---

[5] Contrary holdings in some of this court's cases must be read in their own contexts. For example, in *In re Brown*, 326 Or 582, 595, 956 P2d 188 (1998), the suggestion that all the elements of common-law fraud had to be shown to establish "fraud" under DR 1-102(A)(3) was made in the context of a case in which this court in fact found that all those elements were proven. *See also In re Hiller*, 298 Or 526, 533, 694 P2d 540 (1985) ("We do not interpret 'fraud, deceit or misrepresentation' to be three words for the same thing. A misrepresentation becomes fraud or deceit when it is intended to be acted upon without being discovered.").

the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing").

Determining whether an activity is in the "ordinary course of business" can be difficult. One authority states that "the margin between what is ordinary course and what is not is quite ragged and hard to distinguish." David G. Epstein, Steve H. Nickles, and James J. White, 1 *Bankruptcy* § 4-3 at 379 (1992). The authors of that treatise also observe:

> "The richness and the variety of different factual circumstances—each raising issues never before considered, and most calling for a subtle judgment based upon the particular business involved—make it unlikely that even the most sophisticated test can make the boundary between ordinary course and non-ordinary course smooth and clear."

*Id.*

Courts sometimes rely on horizontal and vertical analyses to evaluate whether a transaction is in the ordinary course of business. The horizontal dimension asks whether the "transaction is of a type that other similar businesses would engage in as ordinary business." *In re Dant & Russell, Inc.*, 853 F2d 700, 704 (9th Cir 1988).

> "[T]his showing is required merely to assure that neither the debtor nor the creditor [did] anything abnormal to gain an advantage over other creditors[;] an extensive showing that such transactions occurred often, or even regularly, is not necessary. The transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally."

*Id.* (quoting *In re Johns-Manville Corp.*, 60 BR 612, 618 (Bankr SD NY 1986)). The vertical dimension "views the disputed transaction 'from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit.' " *Id.* at 705 (quoting *Johns-Manville*, 60 BR at 616). What is "ordinary" depends on the interested parties' reasonable expectations of the kinds of transactions that the debtor-in-possession is likely to enter into in the course of its business. *Id.*

In 1989, a leading bankruptcy treatise made the following points about "ordinary course of business":

> "The strict wording of the statute would bar a trustee from using assets of the estate without a court order if the business were not being operated. Many trustees ignore this in such simple applications as using the desk or office machinery in the debtor's office to examine records or using a fork lift to move items around to prepare for a sale. *Any substantial use that would consume assets or decrease their value palpably should be preceded by court permission.*"

Daniel R. Cowans, et al., 2 *Cowans Bankruptcy Law and Practice* § 11.9(1) at 407 (1989) (emphasis added) (*Cowans*). The accused asserts that he consulted and relied on the emphasized sentence from *Cowans* in determining whether withdrawing funds from Pacific was in the ordinary course of business.

The Bar's expert witness opined that, in light of Wilkinson's "business"—whether characterized as working for a wage or real estate management—cashing-in her insurance policy was not in the ordinary course of business, because a creditor would not expect the debtor to cash-in an insurance policy without notice and an opportunity for a hearing. From that opinion, the Bar argues that the withdrawal could not have been in the ordinary course of business, because Wilkinson's and the accused's purpose was to turn the insurance policy into money so that Wilkinson could hide the money from the Cushmans.

Although the accused's expert did not offer an opinion as to whether withdrawing the insurance funds was an ordinary-course transaction, he did not believe that the accused had made a misrepresentation. The accused's expert stated that he would not have requested a withdrawal *as an ordinary course transaction*; rather, he opined that Wilkinson was entitled to receive the funds as *exempt* from the bankruptcy proceeding. We need not resolve that dispute, however. Even if Wilkinson were entitled to the funds under another theory, such as exemption, the accused would not be justified in making a misrepresentation regarding the ordinary course of business to obtain them.

Although neither expert endorsed the accused's argument that withdrawal of the funds was in the ordinary course of business, the accused's conclusion was not without justification. The accused contends that he researched the issue and concluded that withdrawal of the funds was not a sale or a lease, but could be a "use" of property. The Bar's expert agreed that cashing-in the policy was a "use" under 11 USC § 363. As stated in *Cowans*, one test for whether a use requires court permission is whether that use "would consume assets or decrease their value palpably." The accused argues that, before he wrote the letter, he concluded that transforming an asset from an insurance policy to cash and then investing the cash in another insurance policy would not consume or depreciate the value of the asset. In addition, the bankruptcy court saw no harm in the transformation of the asset and declined to sanction the accused for arguing that cashing-in the policy was a use in the ordinary course of business.

As noted, Wilkinson had no choice but to file under Chapter 11, even though her bankruptcy was a personal one, and in doing so she was asked to declare a business. Even the Bar's expert conceded that Wilkinson's business could be construed as "working for a wage." In the ordinary course of personal affairs, working people open and close bank accounts. Indeed, the Bar's expert conceded that changing banks might be in the ordinary course of business. Moreover, people buy insurance and sometimes change insurance companies. Indeed, it may be sound financial management to obtain funds from an insurance policy, particularly if the insurance company is in financial jeopardy. The Bar has not cited a case factually on point holding that the accused's interpretation of ordinary course of business is incorrect. Given that the accused's representation was within at least the rationale of a "use" that was consistent with the ordinary course of business, when no case appears to hold otherwise, it is not unreasonable to conclude that his letter was aggressive advocacy rather than a misrepresentation.

Whether one accepts the accused's ordinary-course statement as a misrepresentation might depend on an evaluation of the accused's intent, which we must evaluate in any event. The trial panel concluded that the accused conspired

with Wilkinson to defraud the Cushmans, but it might be easy to view those circumstances in hindsight, knowing that Wilkinson absconded with the insurance proceeds. The Bar cites no direct evidence that the accused knew that Wilkinson intended to abscond with the money. The Bar argues, however, that the accused had the requisite intent to defraud, because the bankruptcy court had dismissed Wilkinson's petition as filed in bad faith. In the Bar's view, the accused knew that Wilkinson possessed bad intentions and that obtaining the funds for her was tantamount to engaging in a fraud, because he knew that, consistent with her past behavior, she planned to hide the money from the Cushmans.

That view rests on several faulty assumptions that we cannot accept based on this record. The accused was Wilkinson's lawyer, not the Cushmans' lawyer. His duty was to act in Wilkinson's best interests by legal and ethical means. *See* DR 7-101(A) ("A lawyer shall not intentionally: (1) Fail to seek the lawful objectives of the lawyer's client through reasonably available means permitted by law and [the] disciplinary rules * * *"). As the bankruptcy court observed, the accused did not have a duty to muster Wilkinson's assets for the benefit of the Cushmans' collection efforts. Moreover, lawyers sometimes are called on to represent people who are motivated by bad intentions. Although a lawyer must take great care to observe the ethical requirements of representation, we cannot transfer automatically a client's intent to a lawyer solely because the client has harmed the opposing party.

The Bar argues that the accused was on notice that Wilkinson was engaged in a scheme to defraud and that the accused adopted, or at least knowingly facilitated, that scheme. The Bar, however, specifically stated in oral argument that it did not dispute that the accused had contacted Wilkinson when he discovered, a few days after sending the letter to Pacific, that she had transferred some properties to her boyfriend, and advised her to reverse the transaction, because he believed it was fraudulent. Such unsolicited advice is inconsistent with the view that the accused had adopted or knowingly facilitated Wilkinson's scheme to defraud. The accused also sent a copy of his letter to Pacific to a representative of the United States Trustee, who had

attended the hearing that resulted in the dismissal of Wilkinson's petition. That fact also seems inconsistent with fraudulent intent on the accused's part. Moreover, it is undisputed that the accused did not hide, encumber, devalue, or dissipate Wilkinson's assets. Rather, his letter persuaded Pacific to put the assets into the hands of his client, who arguably had a legal right to them. Wilkinson then absconded with the money to the Cushmans' detriment. Holding that the accused knew that Wilkinson would abscond with the funds would impute a degree of clairvoyance to the accused that we are not willing to impute. *See In re Taylor*, 319 Or 595, 604, 878 P2d 1103 (1994) ("Once the money was in [the client's] possession, there was nothing that the accused could do to control what the client did with it."). In sum, the record lacks clear and convincing evidence that it was "highly probable" that the accused had a fraudulent intent.

The accused's motivation is crucial to the Bar's argument. According to the Bar, the accused quickly submitted the letter to Pacific after the bankruptcy hearing but before the entry of a dismissal order so that Pacific would release the funds before the stay expired. The Cushmans believed that, once the stay had expired, they could garnish the insurance policy and collect on their judgment. In this way, the accused allegedly helped Wilkinson obtain the funds so that she could shelter them from the Cushmans' judgment. It is at least equally plausible, however, that the accused may have moved quickly because he believed that Wilkinson was threatening him with liability for not obtaining the funds for her earlier.

*Taylor* is instructive regarding a lawyer's duties under somewhat similar circumstances. In that case, the accused lawyer's fees were secured by a $25,000 promissory note. That note, in turn, was secured by a trust deed on the client's home. The accused also helped the client sell three contracts for market value. The client subsequently lost the proceeds, in part by gambling. The trial panel concluded that the accused had: (1) caused the client to execute a note secured by a trust deed on the client's home for the sole purpose of deterring creditors from executing on the home; and (2) assisted the client in converting the contracts to cash with

the intention of hiding the assets and failed to prevent the client from squandering the assets. On review, this court emphasized that the Bar had to prove, by clear and convincing evidence, that the accused had the requisite intent to defraud the client's creditors. The accused offered several reasonable explanations for selling the contracts, including potentially structuring a civil settlement and obtaining full market value for the contracts.

In *Taylor*, the Bar argued that the accused's delivery of the cash to the client demonstrated that the accused had no plan to collect the client's assets to facilitate a settlement. This court responded:

> "[I]n the absence of a fraudulent intent, the delivery of the money to the client was not an unethical act, because the money belonged to [the client]. The accused was required to deliver the money to his client, in the absence of other instructions from the client. Once the money was in [the client's] possession, there was nothing that the accused could do to control what the client did with it."

319 Or at 604. The court further noted:

> "The record would permit us to construe the objective facts about the accused's actions concerning the contract sales to sustain either of the parties' competing arguments. The issues are whether the accused engaged in those actions with the requisite fraudulent intent and whether the evidence establishes that intent by clear and convincing evidence."

*Id.* The court concluded that clear and convincing evidence did not support the Bar's claim that the accused had acted with the intent to defraud his client's creditors.

As in *Taylor*, the accused here obtained money for his client and had no control over what the client did with the money after she received it. The facts are capable of supporting either party's view, but the evidence in the record does not permit us to infer that the alleged violations are "highly probable." We conclude that the Bar has failed to prove by clear and convincing evidence that the accused committed fraud, misrepresentation, or dishonesty under DR 1-102(A)(3) in sending his letter to Pacific. Although in hindsight, the accused's opinion may be incorrect, his legal

research gave him some basis for making the representation. Accordingly, we decline to discipline the accused for a representation regarding an application of law to these facts.

## 2. *Omission of Pending Dismissal*

■ The Bar argues that it was a material misrepresentation by omission for the accused not to mention in his letter to Pacific that Wilkinson's bankruptcy action was about to be dismissed. As noted, material information is information that, if it had been known by the court or other decision-maker, would or could have influenced the decision-making process significantly. *Gustafson*, 327 Or at 649. No representative of Pacific testified that that information would have changed Pacific's decision to release the funds to Wilkinson. Moreover, the Bar's own expert was equivocal about whether the omission was a material misrepresentation, although he opined that it would have been more accurate to disclose that the bankruptcy court orally had dismissed the case but that a written order had not yet been entered. We conclude that there was insufficient evidence of the materiality of this omission and that, under these circumstances, it was not "highly probable" that the accused made a material misrepresentation by omission.

## B. *DR 7-102(A)(7)*

■ Finally, the Bar contends that the accused violated DR 7-102(A)(7), which provides that, in the lawyer's representation of a client, a lawyer shall not "[c]ounsel or assist the lawyer's client in conduct that the lawyer knows to be illegal or fraudulent." This court has observed:

> "[A] lawyer's zealous representation of a client must remain 'within the bounds of the law.' A lawyer must be able to advise and assist clients in their affairs without fear of discipline if he is wrong in interpreting close questions of law. He or she must be given some latitude to be wrong."

*Hockett*, 303 Or at 160. For the reasons stated above, we conclude that the Bar has failed to prove by clear and convincing evidence that the accused counseled or assisted Wilkinson in conduct that the accused *knew* to be illegal or fraudulent. Rather, the accused persuaded Pacific to release funds that

belonged to his client. The accused's act was not an illegal or fraudulent act.

We conclude that the Bar has failed to prove by clear and convincing evidence that the accused violated either DR 1-102(A)(3) or DR 7-107(A)(7).

Complaint dismissed.