Filed: January 12, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON

In re Complaint as to the Conduct of

JOHN S. MARANDAS,

Accused.

(OSB 07-03; SC S058559)

On review of the decision of a trial panel of the Disciplinary Board.

Argued and submitted November 7, 2011.

Roy Pulvers, Hinshaw & Culbertson LLP, Portland, argued the cause and filed the briefs for the accused. With him on the briefs was David J. Elkanich, Portland.

Jeffrey D. Sapiro, Disciplinary Counsel, argued the cause and filed the brief for the Oregon State Bar.

Before De Muniz, Chief Justice, and Durham, Balmer, Kistler, Walters, and Landau, Justices.*

PER CURIAM

The complaint is dismissed.

*Linder, J., did not participate in the consideration or decision of this case.

PER CURIAM

The Oregon State Bar charged John S. Marandas (the accused) with numerous violations of the Rules of Professional Conduct and the Disciplinary Rules of the Code of Professional Responsibility.[1] A trial panel found that the accused had violated RPC 8.4(a)(3) and *former* DR 1-102(A)(3) by acting dishonestly and by making misrepresentations to the court and other parties and RPC 8.4(a)(4) by engaging in conduct prejudicial to the administration of justice.[2] The trial panel suspended the accused for three months. We review the decision of the trial panel *de novo*. ORS 9.536(2); BR 10.6. Because we conclude that the Bar failed to prove by clear and convincing evidence that the accused's conduct violated any of the cited rules, we dismiss the complaint.

## I. FACTUAL BACKGROUND

The facts of the underlying litigation that gave rise to the Bar's allegations are extensive and complex. We recite only the facts necessary to evaluate the Bar's charges against the accused. In 1998 and 1999, the accused represented husband, Pohrman, in a dissolution proceeding. As part of the dissolution order, the court awarded husband an equalizing judgment of $24,134 against his wife. The court ordered that the

---

[1] The Rules of Professional Conduct (RPCs) took effect January 1, 2005. Because the alleged violations occurred before and after that date, the Disciplinary Rules (DRs) apply to the accused's earlier actions, and the RPCs apply to his later actions. The minor differences between the applicable DRs and RPCs do not affect our analysis.

[2] We quote the applicable rules in full later in this opinion.

equalizing judgment be paid out of the proceeds from the sale of the family house. Under *former* ORS 18.350(1) (2001), *repealed by* Oregon Laws 2003, chapter 576, section 580, the equalizing judgment became a lien on the property.

Husband was unable or unwilling to pay all the accused's fees, and, at the conclusion of the representation, husband owed the accused $24,826. In September 1999, the accused filed and recorded an attorney's lien against husband's equalizing judgment on the house. By September 2000, husband was delinquent in paying child support and servicing other marital debts as required by the dissolution order. Wife, represented by attorney Carroll, and husband, *pro se*, entered into a stipulated order that would relieve husband of his past-due child support payments and other obligations in exchange for releasing the equalizing judgment as a lien against the house. Neither husband nor wife notified the accused that they sought to modify the equalizing judgment and release the lien, and the accused was not present at the modification hearing. Despite the accused's absence, the court signed the stipulated order and removed the equalizing judgment as a lien against the house.

Wife later sought to refinance and then to sell the house. In connection with that effort, Chicago Title Company contacted the accused in August 2001 regarding his attorney's lien. After speaking with Chicago Title, the accused drafted a motion and stipulated order that provided that his lien would be satisfied out of the expected proceeds from the refinance (or sale) of the house, but wife refused to sign the order. In November 2001, Chicago Title prepared a title report that did not include any reference to the accused's lien. The house sale closed soon thereafter without the accused's lien being

2

satisfied.

In December 2001, the accused filed a motion to intervene in the underlying dissolution case. He argued that the stipulated order that removed the equalizing judgment as a lien on the house had been enetered without notice to him and should be voided. The court granted the accused's motion and voided the 2000 order. Accordingly, husband's equalizing judgment on the property was reinstated, and the accused's lien was immediately due, because the house had been sold.

The accused later filed a complaint, in the dissolution proceeding, against Chicago Title, the purchasers of the house, the mortgage lender, husband, and wife. The accused added Carroll, wife's attorney at dissolution, as a defendant in early 2003. The accused asserted various claims against those defendants, including fraudulent transfer, negligence, and interference with prospective advantage, and sought declaratory and injunctive relief to enforce and foreclose his lien. (Certain claims were asserted against some, but not all, defendants.) The complaint also sought attorney fees under ORS 20.105, which directs a court to provide attorney fees when a party asserts a defense that is not objectively reasonable.[3] The accused alleged that his damages were the amount of

---

[3] ORS 20.105(1) provides:

"In any civil action, suit or other proceeding in a circuit court or the Oregon Tax Court, or in any civil appeal to or review by the Court of Appeals or Supreme Court, the court shall award reasonable attorney fees to a party against whom a claim, defense or ground for appeal or review is asserted, if that party is a prevailing party in the proceeding and to be paid by the party asserting the claim, defense or ground, upon a finding by the

3

his attorney's lien plus interest and his attorney fees.

In February 2003, the accused began settlement negotiations with Chicago Title, the home purchasers, and the lender (collectively, the Chicago Title defendants). The accused asserted in settlement negotiations that his total damages were $77,729, which included the amount of his attorney's lien plus interest at 18 percent per year ($37,966) and his fees accrued in attempting to collect the amount that husband originally owed him by foreclosing on the lien ($39,758). The accused suggested that the Chicago Title defendants were 75 percent responsible for his damages and stated that he would settle for $58,000. As part of his settlement offer, the accused wanted the Chicago Title defendants to keep the settlement terms confidential, to waive all rights of contribution and indemnification against the nonsettling defendants, and to stipulate that the settlement money would be apportioned first to his attorney fees accrued in seeking to enforce the lien, with any remainder off-setting the lien itself. The Chicago Title defendants (through attorney Rudd) counteroffered for $42,000 and agreed, essentially, to the accused's terms. Rudd drafted the settlement agreement with substantial input from the accused.[4]

---

court that the party willfully disobeyed a court order or that there was no objectively reasonable basis for asserting the claim, defense or ground for appeal."

[4] The settlement agreement, as eventually signed, included the following provisions as to confidentiality and the allocation of the settlement amount paid by the Chicago Title defendants:

While the settlement was still being negotiated, wife's attorney at the time, Chase, notified Rudd that wife would oppose the dismissal of the Chicago Title defendants and that the nonsettling defendants were entitled to know the terms of settlement, including the amount, because that amount would be relevant to off-setting the damages that the accused sought from the nonsettling defendants. The nonsettling defendants, however, did not file a cross-claim against the Chicago Title defendants for contribution or indemnification. In April 2003, Chase sought discovery of documents

"3.4  Except as required to comply with applicable laws and regulations regarding public access and disclosure, Defendants will not affirmatively disseminate the terms of this Settlement Agreement including, but not limited to, the amount of the settlement, whether such settlement was favorable or unfavorable or any other communication about the settlement. In the event Defendants believe a law or regulation exists requiring public access or disclosure, Plaintiff shall first be notified. If Plaintiff objects, the parties shall seek an in-camera adjudication of that issue.

"* * * * *

"3.6    The sum paid shall first be applied toward Marandas' attorney fees and costs as represented to have accrued in the proceedings held in both federal and state courts. This does not preclude Marandas from seeking an award of added, unpaid attorney fees from the remaining defendants in the Clackamas County Case No. 98-03-098, as well as added sums to satisfy any attorney's fees, late payment claims and liens Marandas has against the August 1999 money judgment received by [husband] and including any lien Marandas may have on the proceeds distributed to [wife] personally or as trustee at the time of the September, 2001 second mortgage and/or thereafter on proceeds received from the house sale in November, 2001."

Paragraph 3.9 of the settlement agreement provides: "Any release by Marandas of [the Chicago Title defendants] is not intended to release any of the remaining defendants in DR 98-03-098."

5

related to the settlement negotiation from the Chicago Title defendants.  During that time, Rudd and the accused discussed whether *former* ORS 18.455 (2001), *renumbered as* ORS 31.815 (2003),[5] required them to disclose the terms of settlement.  Rudd thought that the statute required disclosure, but the accused disagreed, arguing that the Chicago Title defendants were not joint tortfeasors with the nonsettling defendants -- because the accused had not alleged any tortious act committed by both the Chicago Title defendants and the nonsettling defendants -- and so disclosure was not required.  The accused opposed releasing the terms of the pending settlement agreement and threatened to assert new claims against the Chicago Title defendants if they disclosed the terms of the agreement.

---

[5]     *Former* ORS 18.455 provided:

"(1) When a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury to person or property or the same wrongful death or claimed to be liable in tort for the same injury or the same wrongful death:

"(a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but the claimant's claim against all other persons specified in [ORS 31.600(2)] for the injury or wrongful death is reduced by the share of the obligation of the tortfeasor who is given the covenant, as determined under [ORS 31.605 and 31.610]; and

"(b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

"(2) When a covenant described in subsection (1) of this section is given, the claimant shall give notice of all of the terms of the covenant to all persons against whom the claimant makes claims."

In May 2003, , the attorney for Carroll (wife's attorney at dissolution), Van Rysselberghe, filed a subpoena *duces tecum* seeking release of settlement documents by the Chicago Title defendants, who objected to production. Again, Rudd told the accused that she thought that the settlement terms were discoverable. The accused expressed his opinion to Van Rysselberghe that the settlement was not discoverable under *former* ORS 18.455(2) and that, if necessary, the court could review the settlement *in camera*. The Chicago Title defendants filed a motion for a protective order to prevent disclosure of the settlement agreement and accompanying work product.

In June 2003, the accused and the Chicago Title defendants signed the settlement agreement, and the Chicago Title defendants paid the accused $42,000. As noted, the settlement agreement provided that the amount paid in settlement would be apportioned first to the accused's attorney fees and only then to satisfy the lien. Because the amount paid was insufficient to satisfy both the attorney fees and the entire amount of the lien, the accused took the position that the lien had not been satisfied.

In July 2003, the court heard argument on several motions regarding discovery of the settlement agreement, with Judge Boutin presiding. The accused asserted that the terms of the settlement agreement were confidential and stated that "neither side can divulge any information." At the end of July 2003, based on the settlement agreement, the court dismissed the Chicago Title defendants.

In January 2004, the court issued a letter opinion granting the accused's motion for summary judgment against husband and wife for the amount of the attorney's lien. The court granted summary judgment for the defendants on all other claims. The

court also denied all pending discovery requests. The parties, however, disputed the wording and content of the judgment and, in particular, whether the settlement agreement should be disclosed. Wife's new attorney, Nelson, asked the accused to release the 2003 settlement agreement, intending to recommend that wife pay the difference between the settlement amount and the balance of the lien. Again, the accused refused to disclose the terms of the settlement agreement, arguing that the amount was relevant only after the judgment became final.

In December 2004, the court held another hearing to address the form and content of the order and judgment as well as remaining discovery issues, including disclosure of the settlement agreement. At that hearing, the accused asserted that the agreement was confidential, that he was not trying to recover twice for the same injury, and that no law required him to disclose the agreement. The accused, however, did offer the settlement agreement to the court to review *in camera.* The court declined to review the settlement agreement, because, in the court's view, its terms were not relevant to the accused's claims against the nonsettling defendants.

In January 2006, the court issued an order and general judgment. The court awarded the accused's firm recovery up to the amount of husband's equalizing judgment, $24,134 plus accrued interest at the rate of nine percent, for a total of $38,118. The court dismissed with prejudice all other claims against husband, wife, and Carroll. In the ruling, the court noted that the settlement agreement did "not involve receipt of proceeds chargeable against the lien" and stated that the terms of the settlement "may" be disclosed.

Shortly after the judgment issued, the accused released the settlement agreement to wife and asserted that the $42,000 received pursuant to the settlement went toward attorney fees only and did not off-set wife's obligations under the court's judgment. Wife disagreed and filed a motion to satisfy the judgment.

In March 2006, a different judge, Judge Herndon, granted wife's motion to satisfy the judgment and later awarded her more than $20,000 in attorney fees under ORS 18.235(8), for the accused's willful failure to satisfy a judgment, and under ORS 20.105(1), for the accused's assertion of a claim without an objectively reasonable basis. Judge Herndon took a dim view of the accused's actions, stating that his claims were "utterly without merit" and that the apportionment clause in the settlement agreement was "nothing more than an attempt by plaintiff to 'double dip' on [his] claim for attorney's fees." Soon thereafter, wife filed a bar complaint against the accused. This proceeding followed.

## II. THE TRIAL PANEL DECISION

The trial panel found violations of three disciplinary rules, *former* DR 1-102(A)(3), RPC 8.4(a)(3), and RPC 8.4(a)(4).[6] Before the trial panel, the Bar offered

---

[6] *Former* DR 1-102(A)(3) provided:

"It is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or mispresentation[.]"

RPC 8.4(a)(3) provides:

"It is professional misconduct for a lawyer to * * * engage in conduct involving dishonesty, fraud, deceit or misrepresentation that

9

testimony from its investigators, wife, and attorneys Rudd (counsel for Chicago Title defendants), Nelson (counsel for wife), and Van Rysselberghe (counsel for Carroll), as well as expert testimony from attorney Hamlin. Hamlin's testimony focused on the legitimacy of the accused's legal positions, principally whether the confidentiality provision in the settlement agreement applied to the accused and whether *former* ORS 18.455 required the accused to disclose the terms of the settlement agreement. The accused and other members of his firm testified in his defense. Attorney Eggum testified as an expert on the legal positions that the accused had asserted in the underlying proceeding.

The trial panel concluded as follows:

> "The Accused violated DR 1-102(A)(3) and RPC 8.4(a)(3) in 2003 and again in December 2004, when the Accused misled the court and concealed the disclosure of the settlement terms to the nonsettling defendants. The Accused deliberately, for his own benefit, misstated the terms and origin of the confidentiality provision, particularly with respect to the lack of mutuality as to the restricted disclosure. The record evidence shows the Accused knowingly misled the court by stating that 'neither side can divulge any information.' The Accused knew or should have known

reflects adversely on the lawyer's fitness to practice law[.]"

RPC 8.4(a)(4) provides:

> "It is professional misconduct for a lawyer to * * * engage in conduct that is prejudicial to the administration of justice[.]"

Based on its other findings and conclusions, the trial panel presumably intended also to find that the accused violated *former* DR 1-102(A)(4), which provides that it is professional misconduct "for a lawyer to * * * [e]ngage in conduct that is prejudicial to the administration of justice."

10

that he was legally entitled to divulge the terms of the settlement."[7]

Regarding RPC 8.4(a)(4), the panel found,

> "To the extent that the Accused believed, in good faith, that he could rely upon narrow interpretations of ORS 18.455, the Accused nevertheless should have, but failed to, honestly disclose to the court the meaning of the confidentiality terms that the Accused insisted be included in the settlement agreement. * * * We find that the Bar met its burden of proving that the Accused abused the legal system by his misleading statements to the court."

The panel found that the Bar had failed to prove its other allegations. It determined that the appropriate sanction was a three-month suspension.

## II. MERITS

The accused and the Bar both petitioned this court for review. On review, the accused denies all wrongdoing and asserts that, if he did violate any of the rules as charged, a reprimand is a more appropriate sanction. The Bar argues that the trial panel correctly found that the accused violated *former* DR 1-102(A)(3), RPC 8.4(a)(3), and RPC 8.4(a)(4). The Bar also argues that the panel should have found violations of *former* DR 1-102(A)(4), *former* DR 7-102(A)(2), and RPC 3.1, and that it erred in not doing so. The Bar asserts that a two-year suspension is appropriate.[8]

---

[7] As the accused notes, contrary to the statement in the trial panel opinion, he could not be guilty of violating RPC 8.4(a)(3) for his conduct in 2003 and 2004, because that rule was not in force until 2005. Nevertheless, RPC 8.4(a)(3) was in effect at the time of the hearings before Judge Herndon in 2006.

[8] The Bar did not appeal the trial panel's findings that the accused did not violate of DR 7-102(A)(1) (taking actions to harass or maliciously injure), RPC 3.4(a) (obstructing access to evidence), or RPC 8.4(a)(3) (making a misrepresentation during the Bar's investigation).

A.    *Alleged Misrepresentations:  RPC 8.4(a)(3) and Former DR 1-102(A)(3)*

We begin with the accused's appeal of the violations that the trial panel found.  First, the trial panel found that the accused violated RPC 8.4(a)(3) and *former* DR 1-102(A)(3) by misrepresenting the terms of the settlement agreement when he asserted that the agreement was "confidential."  The trial panel found that the accused repeatedly asserted in court proceedings and to other parties that the confidentiality provision in the settlement agreement prohibited him from disclosing its terms.  The trial panel determined, however, that "[by] its express and unambiguous terms, the settlement agreement signed by the [a]ccused and the Chicago Title [d]efendants imposed upon the [a]ccused no obligation to maintain as secret the settlement amounts paid."  In the trial panel's legal analysis, the confidentiality provision was not binding on the accused.  It therefore concluded that the accused made knowing and material misrepresentations regarding the settlement agreement.

RPC 8.4(a)(3) and *former* DR 1-102(A)(3) prohibit an attorney from making "misrepresentations" to the court or to other parties that are knowing, false, and material.  *See In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001) (so stating for DR 1-102(A)(3)).  To establish a violation of either rule, the Bar must prove, by clear and convincing evidence, that the accused's statements to the court and parties regarding confidentiality were false, that the accused *knew* those statements to be false, and that the statements were material -- that is, that they "would or could significantly influence the hearer's decision-making process."  *Id*.; s*ee also In re Huffman*, 331 Or 209, 218, 13 P3d 994 (2000) ("material facts" are those that, had they "been known by the court or other

12

decision-maker, would or could have influenced the decision-making process significantly" (quoting *In re Gustafson*, 327 Or 636 648-49, 968 P2d (1998))). Accordingly, for the accused to be found to have violated the charged rules, the evidence must prove not only that the settlement agreement did not legally bind the accused to maintain the confidentiality of the agreement and its terms, but also that the accused could not reasonably have believed that the agreement imposed such a duty and that his statements would or could have affected the decisions of the parties or the court.

The alleged misrepresentations include the accused's statements that "neither side can divulge any information" and that the agreement "has a confidentiality provision in it that simply says it's not to be disclosed." As noted, the trial panel reached the legal conclusion that the settlement agreement did not prevent the accused from disclosing its terms. From that proposition, it concluded that the accused's statements were false and misleading. We disagree.

We again quote paragraph 3.4 of the settlement agreement:

"Except as required to comply with applicable laws and regulations regarding public access and disclosure, [Chicago Title] Defendants will not affirmatively disseminate the terms of this Settlement Agreement including, but not limited to, the amount of the settlement, whether such settlement was favorable or unfavorable or any other communication about the settlement. In the event Defendants believe a law or regulation exists requiring public access or disclosure, Plaintiff [the accused] shall first be notified. If Plaintiff objects, the parties shall seek an in-camera adjudication of that issue."

Paragraph 3.4 does not, by its terms, impose any obligation on the accused

13

to keep the settlement agreement confidential; the explicit obligations run to the Chicago Title defendants.[9] Nevertheless, the accused asserts that he reasonably believed that he was bound to keep the agreement confidential in light of its text and context. For textual support, the accused points to the title of the settlement -- "Confidential Settlement Agreement and Release" -- which, in his view, indicates that the entire agreement was confidential, even if paragraph 3.4 placed an explicit obligation only on the Chicago Title defendants.

For support outside of the terms of the agreement, the accused points to communications between the parties early in the negotiations, in which both parties agreed that the agreement should be confidential. The accused also argues that Rudd, attorney for the Chicago Title defendants, made multiple assertions to the accused and to opposing parties that the terms of the agreement were confidential and that the confidentiality provision was binding on both parties. Indeed, Rudd repeatedly stated, in letters and court filings, that the settlement agreement "includes a provision that the terms of the settlement agreement shall remain confidential." Finally, the accused relies on expert testimony from Eggum. Before the trial panel, Eggum opined that the agreement could be interpreted as binding both parties to silence based on the relationship between the parties and the accused's clear intent to keep the agreement secret, regardless of the

---

[9] The accused correctly notes that the trial panel erroneously stated that the settlement "expressly and unambiguously" imposed no obligation on defendant when, at most, the terms of the agreement imposed an obligation on the Chicago Title defendants while remaining silent as to the accused's obligations.

14

fact that paragraph 3.4 allocated greater authority to the accused than to the Chicago Title defendants to control the release of information. Eggum testified -- and the Bar's expert, Hamlin, agreed -- that confidentiality provisions in settlement agreements and other documents ordinarily bind both parties, even though one party may have a greater interest in preserving confidentiality than the other. Indeed, Hamlin could not recall a confidentiality provision in any settlement agreement that was not mutually binding.

The Bar counters that the confidentiality provision was included at the accused's insistence and that the Chicago Title defendants' consent to include the provision in the settlement agreement does not prove that the agreement was binding on both parties. Similarly, the Bar argues that Rudd was correct in asserting to the court and other parties that the agreement was confidential as to her clients because, as indicated by paragraph 3.4, the Chicago Title defendants could not disclose the agreement or its terms without the accused's consent. In the Bar's view, then, Rudd's statements show only her understanding that her clients -- and not necessarily the accused -- were bound to maintain the confidentiality of the terms of the settlement agreement.

On *de novo* review, we conclude that the Bar did not prove by clear and convincing evidence that the accused made a knowing misrepresentation to the court or the opposing parties when he asserted that he could not disclose the terms of the settlement agreement because those terms were "confidential." Viewing the accused's statements as *factual representations* regarding the settlement agreement, we find that the title and terms of the settlement agreement, the factual context of the negotiations that led to that agreement, Rudd's understanding of the "mutuality" of the confidentiality

15

provision, and the expert testimony about confidentiality provisions in settlement agreements provide, at a minimum, some basis for the accused's factual assertion that the terms of the agreement were "confidential."

If we instead view the accused's statements as asserting a legal proposition that the settlement agreement imposed a duty of confidentiality on him, rather than as statements of fact, we reach the same conclusion. An attorney cannot be disciplined for making a "misrepresentation" in litigation if the relevant statement reflects a plausible legal theory. *See In re Claussen*, 331 Or 252, 267-68, 14 P3d 586 (2000) (attorney did not violate *former* DR 1-102(A)(3) when "his legal research gave him some basis for making the representation"). Because the accused's statements regarding the confidentiality of the agreement were plausible both legally and factually, the accused did not make a knowing misrepresentation in violation of RPC 8.4(a)(3) and *former* DR 1-102(A)(3). We need not decide whether the agreement, properly interpreted, actually required the accused to keep its terms confidential. It is sufficient that the accused presented a plausible legal argument in support of his position that the settlement agreement required him to keep the agreement confidential.

The Bar's charge fails for an additional reason. Assuming, *arguendo*, that the accused's statements were knowingly false, there is no evidence in the record that those statements had or could have had any effect on any decision by the court or any party. The accused, while asserting to Judge Boutin that the confidentiality provision was binding on him, nevertheless proposed that Judge Boutin review the settlement agreement *in camera*. Judge Boutin declined to review the agreement, because *he*

16

*concluded that it was not relevant.*  In those circumstances, it is difficult to understand how the accused's alleged misrepresentations could have had any effect on Judge Boutin's decision making.  Similarly, nothing in the record suggests that any of the attorneys to whom the accused made the statements was affected by them in any way.  Rudd, of course, knew the actual terms of the settlement agreement.  The other attorneys sought disclosure of the settlement agreement and related documents without regard to whether the accused's statements about the confidentiality provision were true or not.  Nothing in the record indicates that the statements would or could have had any effect on any person's decision-making process.  The statements were not material for the purposes of RPC 8.4(a)(3) and *former* DR 1-102(A)(3).

B.     *Alleged Dishonesty:  RPC 8.4(a)(3) and Former DR 1-102(A)(3)*

The Bar also alleged, and the trial panel generally agreed, that the accused acted dishonestly and in violation of RPC 8.4(a)(3) and *former* DR 1-102(A)(3) by attempting to obtain a "double recovery" -- that is, he tried to recover more from the parties named in the complaint that he filed in the dissolution proceeding than the maximum amount to which he plausibly was entitled based on the allegations in his complaint.  As noted, the accused sought to recover the attorney fees due to him from husband (which was the basis for his attorney's lien), plus interest, plus the fees accrued in seeking to recover the fees originally due.  The Bar asserts that the accused's motive in refusing to disclose the settlement agreement with the Chicago Title defendants -- including the settlement amount that those defendants had paid -- was to keep the remaining defendants in the dark about that amount, in the hope that the total amount that

17

the accused eventually recovered through settlement or litigation would exceed the amount to which he was entitled. If that had occurred, the accused would have obtained, at least in part, a "double recovery."

The Bar concedes that there is no direct evidence that the accused attempted such a double recovery. It instead asks that we infer from the settlement agreement, and from the accused's efforts to prevent discovery of the agreement, that the accused schemed to recover twice on his lien. The Bar also points out that Judge Herndon, in ruling that the Chicago Title defendants' payment satisfied the attorney lien and awarding wife attorney fees, payable by the accused, commented that, in his view, the accused was attempting to "double dip." The accused argues, not surprisingly, that, although he sought full recovery of the amount that he reasonably thought was due to him, he did not intend to recover more than that amount. Moreover, it is undisputed that no "double recovery" actually occurred.

For the reasons discussed above, the Bar did not prove that the accused made a knowing misrepresentation to the court. Moreover, the accused released the settlement agreement shortly after judgment had been entered in the lien case and Judge Boutin had stated that the agreement "may" be released. That leaves the "inferences" from the accused's conduct throughout the proceeding that, the Bar argues, purportedly demonstrate his intention to obtain a double recovery -- or, at least, more than he arguably was entitled to recover. Although one possible inference that could be drawn from the accused's conduct was that he was hiding the amount that he had received in settlement in the hope of a double recovery, it is just as plausible to infer that he declined

18

to disclose the amount as a negotiation tactic in an effort to recover as much as possible from the remaining defendants, but not more than the amount he was owed. The weak and qualified inference that the Bar urges us to draw from the accused's conduct does not constitute proof by clear and convincing evidence of dishonesty on the accused's part.

Stated differently, the accused had plausible legal arguments for seeking attorney fees for his efforts to foreclose on his attorney's lien and collect the amount that was owed to him; for settling with the Chicago Title defendants in an agreement that characterized the settlement payment as applying first to the fees incurred in the litigation and only then to the satisfaction of the lien; and for declining to disclose the settlement terms to the remaining defendants. Although the settlement agreement's purported application of the settlement payment was not binding on the court -- as the accused learned when Judge Herndon rejected the accused's apportionment argument and made the accused pay wife's attorney fees -- the steps taken in pursuit of settlement and of his attorney fee claim had a basis in law, even if the accused's claim for fees under ORS 20.105(1) was unlikely to succeed in litigation. *See Claussen*, 331 Or at 267-68 ("Although in hindsight, the accused's opinion may be incorrect, his legal research gave him some basis for making the representation."). Indeed, the Bar acknowledges that there was nothing improper about the settlement agreement itself. As discussed below, an attorney may not be disciplined for asserting plausible positions in litigation, assuming that the positions were not asserted for a clearly impermissible purpose. The Bar has not proved by clear and convincing evidence that the accused engaged in dishonest conduct in violation of RPC 8.4(a)(3) and *former* DR 1-102(A)(3).

19

C.     *Alleged Conduct Prejudicial to the Administration of Justice:  RPC 8.4(a)(4) and Former DR 1-102(A)(4)*

We next consider the trial panel's finding that the accused engaged in "conduct prejudicial to the administration of justice," in violation of RPC 8.4(a)(4) and *former* DR 1-102(A)(4).  To prove a violation of either of those rules, the Bar must show that "(1) the accused lawyer's action or inaction was improper; (2) the accused lawyer's conduct occurred during the course of a judicial proceeding * * *; and (3) the accused lawyer's conduct had or could have had a prejudicial effect upon the administration of justice." *In re Kluge*, 335 Or 326, 345, 66 P3d 492 (2003) (citing *In re Haws*, 310 Or 741, 746-48, 801 P2d 818 (1990) (so stating for *former* DR 1-102(A)(4))).  In determining whether an attorney violated RPC 8.4(a)(4) or *former* DR 1-102(A)(4), "[t]he focus of the rule is on the *effect* of a lawyer's conduct on the administration of justice, rather than on the lawyer's state of mind when the conduct is undertaken." *In re Claussen*, 322 Or 466, 482, 909 P2d 862 (1996) (emphasis in original) (so stating for *former* DR 1-102(A)(4)).

The Bar argues that the accused caused prejudice to the administration of justice by seeking a duplicate recovery and by making misrepresentations to the court regarding the confidentiality of the settlement agreement.  To support that allegation, the Bar relies on its arguments regarding RPC 8.4(a)(3) and *former* DR 7-102(A)(3) -- *viz.*, that the accused made knowing and material misrepresentations and that he acted dishonestly.  The Bar also asserts that the accused's recalcitrance in failing to disclose the terms of the settlement agreement significantly delayed the resolution of his initial

attorney fee claim, resulting in unnecessary court appearances and increased costs to the judicial system and to the multiple parties that became involved. The Bar argues that, if the accused violated the rules cited above, then he necessarily caused prejudice to the administration of justice.

For his part, the accused again asserts that the legal positions that he took throughout the litigation were plausible and taken in good faith and that, therefore, those positions cannot constitute improper conduct. Additionally, the accused asserts that no prejudice to the administration of justice could have arisen out his delay in disclosing the terms of the settlement agreement because Judge Boutin did not order the settlement agreement to be released prior to judgment and, in fact, Judge Boutin declined to review the agreement *in camera*, despite the accused's suggestion to do so. Thus, the accused argues, any delay in the proceeding and any resulting costs did not result from the accused's representations about the agreement but, rather, stemmed from the litigation itself and from Judge Boutin's view that the terms of the agreement were not relevant.

We concluded above that the Bar did not prove by clear and convincing evidence that the accused made knowing misrepresentations to the court or the parties or that he acted dishonestly. Those alleged violations, therefore, cannot serve as the basis for a violation of RPC 8.4(a)(4) and *former* DR 1-102(A)(4). Nevertheless, the Bar asserts that the accused may still be disciplined because his conduct had a prejudicial effect on the administration of justice, even if he did not intend to make any misrepresentations or to act dishonestly. *See Claussen*, 322 Or at 482 (focus of *former* DR 1-102(A)(4) is on effect of accused's actions rather than state of mind).

For the Bar to prove that the accused's conduct had a prejudicial effect on the administration of justice, the Bar first must prove that the accused's conduct was improper. *See Kluge*, 335 Or at 345 (so stating for *former* DR 1-102(A)(4)). In this case, for the reasons discussed above, the Bar failed to prove that the accused acted improperly. The accused advanced plausible legal arguments during the litigation, responded to requests for information from the court and other parties, and did not make knowing misrepresentations of material fact with respect to the terms of the settlement agreement. His approach to the litigation may have been more combative and aggressive than was appropriate or reasonable in the circumstances, but it violated no ethical rule.[10] Advancing plausible legal positions and litigating those positions aggressively is not improper conduct, even for an attorney litigating on his own behalf. Accordingly, the accused did not engage in conduct prejudicial to the administration of justice.

D.      *Alleged "Frivolous" and "Unwarranted" Legal Positions:  RPC 3.1 and Former DR 1-102(A)(2)*

We turn to the Bar's assertion that the trial panel should have found violations of RPC 3.1 and *former* DR 7-102(A)(2). RPC 3.1 provides, "[A] lawyer shall

_____

[10]     The Bar argues that Judge Herndon's determination that the accused's attorney's lien had been satisfied by the settlement payment and that the accused took legal positions that lacked any objectively reasonable basis shows that the accused acted improperly. The merits of Judge Herndon's order are not before the court in this proceeding. Moreover, factual and legal determinations in other proceedings are not binding on this court in disciplinary cases, where the substantive legal rules and the standard of proof are different. *See In re Gygli*, 273 Or 443, 450, 541 P2d 1392 (1975) (declining to use collateral estoppel to find violation of disciplinary rules based on federal court determination of liability in civil securities law case).

22

not knowingly bring or defend a proceeding [or] assert a position therein * * * unless there is a basis in law and fact for doing so that is not frivolous * * *." Similarly, *former* DR 7-102(A)(2) provided that "a lawyer shall not * * * knowingly advance a claim or defense that is unwarranted under existing law * * *." RPC 1.0(h) defines "knowingly" as "denot[ing] actual knowledge of the fact in question." *See also In re Merkel*, 341 Or 142, 148, 138 P3d 847 (2006) (requiring actual knowledge to prove "knowing" conduct under the Disciplinary Rules).

The trial panel correctly found that the Bar did not prove violations of RPC 3.1 and *former* DR 7-102(A)(2). The Bar's primary contention with respect to that charge -- other than the alleged misrepresentations regarding the settlement agreement, which we have discussed in detail above -- is that the accused made a frivolous argument that disclosure of the settlement was not required by *former* ORS 18.455. As noted earlier, that statute required that a covenant not to sue "given in good faith to one of two or more persons liable in tort for the same injury" must be disclosed to "all persons against whom the claimant makes claims." The accused argued that his complaint asserted different claims against the various defendants and that he did not view the Chicago Title defendants as joint tortfeasors with the nonsettling defendants. Accordingly, in his view, the settlement was *not* a settlement with some but not all of the "persons liable in tort for the same injury," and *former* ORS 18.455 therefore did not apply. Based on the complaint that the accused filed, the settlement agreement, and the testimony in the record, we conclude that the accused's proffered interpretation of *former* ORS 18.455, as applied to the facts of his case, was plausible. We need not determine whether his

23

interpretation was ultimately correct or not -- it is sufficient to conclude, as we do, that it was not "frivolous" or "unwarranted" within the meaning of the disciplinary rules. In addition, of course, the parties litigated that very issue before Judge Boutin, and the accused prevailed. The trial panel correctly rejected the Bar's claim that the accused violated RPC 3.1 and *former* DR 7-102(A)(2).

## III.  CONCLUSION

Although we conclude that the Bar failed to prove the allegations against the accused by clear and convincing evidence, that does not mean that we condone the accused's conduct. The accused turned a legitimate attorney fee claim for $24,000 into a multi-year proceeding that involved more than a dozen court appearances, ensnared multiple parties, and ultimately cost the accused and the other parties many times the amount that was originally at issue.[11]  However, the Rules of Professional Conduct do not, and cannot, guarantee that attorneys will act reasonably and professionally in the multitudinous factual settings of litigation. As this court has noted, "[N]ot every negligent or unprofessional act, no matter how misguided, boorish, or rude, gives rise to an ethical violation." *In re Paulson,* 341 Or 13, 27, 136 P3d 1087 (2006).

Alternatives exist to deal with such conduct, however. Trial courts have the

---

[11]    We do not mean to suggest that the accused was the only party to blame for the delays and unnecessary costs. Evidence in the record indicates that wife first approached another title company to assist in the refinancing and sale of the house, but then turned to Chicago Title, which apparently was willing to provide a title report for the house that did not disclose the accused's attorney's lien and then to close the house sale without notice to the accused.

authority to control and sanction improper behavior by lawyers in proceedings before them by imposing sanctions under ORCP 17 or other rules or by awarding attorney fees under ORS 20.105 or as authorized by other statutes.  Here, Judge Herndon ordered the accused to pay wife more than $20,000 in attorney fees, because he concluded that the accused willfully had failed to satisfy a judgment and had asserted a claim without an objectively reasonable basis.[12]  In other litigation contexts, sanctions by trial courts with an intimate knowledge of the alleged misconduct may be appropriate, even though the misconduct does not violate a specific Rule of Professional Conduct or cannot be proved by the more rigorous clear and convincing evidence standard that applies in disciplinary proceedings.[13]

The complaint is dismissed.

---

[12]    As noted, the validity of Judge Herndon's order is not before the court, and we express no opinion as to that order.

[13]    Of course, although we conclude that the Bar did not prove its charges in this case, misconduct that results in trial court sanctions also may violate the Rules of Professional Conduct and may serve as an appropriate basis for the Bar to charge a lawyer with violating those rules.